UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASHLEIGH MASON, DAN MORSE, RYAN CARROLL, OSAGIE EHIGIE, and TRAVIS STREETER, on behalf of themselves and all others similarly-situated, | Civ. No. 17-cv-04780 (MKB) (RLM) |
| Plaintiffs, | |
| -against- | |
| LUMBER LIQUIDATORS, INC., | |
| Defendant. | |

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR COURT AUTHORIZED NOTICE PURSUANT TO 29 U.S.C. § 216(b)

Christine L. Hogan
Kevin K. Yam
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

*Attorneys for Defendant*

TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ................................................................................. 1

II.     STATEMENT OF FACTS ................................................................... 2

        A.      LL's Business And Store Management Structure................................. 2

        B.      The Actual Duties And Time Spent Performing Different Duties Vary
                Significantly Among SMs Based On Numerous Different Factors...................... 3

                1.      LL's Expectations as to SMs' Job Duties .................................... 3

                2.      SMs' Job Duties Vary Based on a Variety of Unique Factors ................. 5

                        a.      Differences In Store Location and Sales Volume Affect
                                Staffing Needs................................................... 6

                        b.      SMs' Varying Management Styles and Focus............................ 8

                        c.      Varying Skill Levels, Backgrounds, and Need For
                                Discipline of Employees Affect SMs' Duties ......................... 10

                        d.      Different Store Layout, Design and SMs' Discretion................ 11

                        e.      Varying Levels Of Supervision By The Regional Manager........ 12

                        f.      Special Assignments Or Roles For Certain SMs Within LL ....... 13

III.    LEGAL ARGUMENT – THRESHOLD ISSUE ................................................. 14

IV.     LEGAL ARGUMENT – SIMILARLY SITUATED .......................................... 17

        A.      The Exemption Questions at Issue in this Case Are Complex and Require
                an Investigation Into the Applicable Regulations and SMs' Actual Job
                Duties ................................................................................. 18

        B.      Conditional Certification and Court Authorized Notice Is Discretionary
                And Should Only Be Granted In "Appropriate" Cases ........................... 20

                1.      Lawful Uniform Policies Do Not Support the Grant of Conditional
                        Certification .................................................................. 22

                2.      Plaintiffs' Declarations Also Fail To Show That They And All
                        Other Putative Collective Members Are Similarly Situated................. 23

        C.      Collective Adjudication Of the Applicable Exemptions To SMs
                Necessarily Involves Individualized Inquiries Rendering Collective
                Treatment Unmanageable And Inefficient........................................... 27

V.      ARGUMENT – FORM OF NOTICE.......................................................... 29

VI.     CONCLUSION..................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmed v. T.J. Maxx Corp.*,
   2014 U.S. Dist. LEXIS 138240 (E.D.N.Y. Sept. 24, 2014)..............................................21, 24

*Am.'s Health & Resource Ctr., Ltd. v Promologics, Inc.*,
   2018 WL 3474444 (N.D. Ill. July 19, 2018) .........................................................................17

*Barfield v. New York City Health & Hospitals Corp.*,
   2005 U.S. Dist. LEXIS 28884 (S.D.N.Y. Nov. 18, 2005).....................................................25

*Bristol Myers Squibb v. Sup. Ct. of Cal.*,
   137 S. Ct. 1773 (2017) ................................................................................................ *passim*

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016)...........................................................................................15, 16

*Zheng v. Good Fortune Supermarket Grp. (USA), Inc.*,
   2013 U.S. Dist. LEXIS 130673 (E.D.N.Y. Sept. 12, 2013) (Mann, J.).................................24

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)......................................................................................................14, 15

*In re Dental Supplies Antitrust Litig.*,
   2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017) ......................................................................16

*Diaz v. Electronics Boutique of Am., Inc.*,
   2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 13, 2005)......................................................23

*Diaz v. S & H Bondi's Dept. Store*,
   No. 2012 WL 137460 (S.D.N.Y. Jan. 18, 2012).....................................................................31

*Fa Ting Wang v. Empire State Auto Corp.*,
   2015 WL 4603117 (E.D.N.Y. July 29, 2015) ..................................................................29, 31

*Fasanelli v. Heartland Brewery, Inc.*,
   516 F. Supp. 2d 317 (S.D.N.Y. 2007)...................................................................................29

*Gazzillo v. Ply Gem Indus., Inc.*,
   2018 WL 5253050 (N.D.N.Y. Oct. 22, 2018) .......................................................................16

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011)............................................................................................................14

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*Gordon v. Kaleida Health*,
   2009 U.S. Dist. LEXIS 95729 (W.D.N.Y. Oct. 14, 2009)......................................30

*Guillen v. Marshalls of MA, Inc.*,
   841 F.Supp.2d 797 (S.D.N.Y. 2012), *adopted*, 2012 WL 2588771 (S.D.N.Y.
   July 2, 2012)......................................28

*Guillen v. Marshalls of MA, Inc.*,
   750 F. Supp. 2d 469 (S.D.N.Y. 2010)......................................22

*Hinterberger v. Catholic Health Sys.*,
   2009 U.S. Dist. LEXIS 97944 (W.D.N.Y. Oct. 21, 2009)......................................30

*Hoffman-LaRoche Inc. v. Sperling*,
   493 U.S. 165 (1989)......................................28

*Ikikhueme v. CulinArt, Inc.*,
   2013 U.S. Dist. LEXIS 77720 (S.D.N.Y. June 3, 2013)......................................28

*Jenkins v. TJX Co. Inc.*,
   853 F. Supp. 2d 317 (E.D.N.Y. 2012) ......................................22

*Khan v. Airport Mgmt. Servs., LLC*,
   2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011)......................................23

*Kucker v. Petco Animal Supplies Stores, Inc.*,
   2016 WL 237425 (S.D.N.Y. Jan. 19, 2016) ......................................31

*Laroque v. Domino's Pizza, LLC*,
   557 F. Supp. 2d 346 (S.D.N.Y. 2008)......................................24

*Lin v. Benihana Nat'l Corp.*,
   755 F. Supp. 2d 504 (S.D.N.Y. 2010)......................................21, 29

*Maclin v. Reliable Reports of Texas, Inc.*,
   314 F. Supp. 3d 845 (N.D. Ohio 2018)......................................15, 16

*Martin v. Sprint/United Mgmt. Co.*,
   2016 WL 30334 (S.D.N.Y. Jan. 4, 2016) ......................................29

*Michael v. Bloomberg L.P.*,
   2015 WL 1810157 (S.D.N.Y. Apr. 17, 2015)......................................29

*Myers v. Hertz*,
   624 F.3d 537 (2d Cir. 2010)...................................... *passim*

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*Novak v. Tucows, Inc.*,
2007 WL 922306 (E.D.N.Y. Mar. 26, 2007), *aff'd*, 330 F. App'x 204 (2d Cir. 2009) ..................................................................................................................25

*Prizmic v. Armour, Inc.*,
2006 WL 1662614 (E.D.N.Y. June 12, 2006) .......................................................21

*Romero v. H.B. Auto. Grp., Inc.*,
2012 U.S. Dist. LEXIS 61151 (S.D.N.Y. May 1, 2012)........................................21

*Roy v. Fedex Ground Package Sys.*,
2018 WL 6179504 (D. Mass. Nov. 27, 2018) ......................................................17

*Sae Han Sheet Co. v. Eastman Chem. Corp.*,
2017 WL 4769394 (S.D.N.Y. Oct. 19, 2017) .......................................................16

*Shajan v. Barolo, Ltd.*,
2010 WL 2218095 (S.D.N.Y. June 2, 2010) ........................................................30

*Sharma v. Burberry Ltd.*,
52 F. Supp. 3d 443 (E.D.N.Y. 2014) ....................................................................30

*Spratley v. FCA US LLC*,
2017 WL 4023348 (N.D.N.Y. Sept. 12, 2017) .....................................................16

*Vasquez v. Vitamin Shoppe Indus. Inc.*,
2011 U.S. Dist. LEXIS 74376 (S.D.N.Y. July 11, 2011) ......................................29

*Yap v. Mooncake Foods Inc.*,
146 F. Supp. 3d 552 (S.D.N.Y. Nov. 18, 2015)....................................................30

**Statutes**

29 U.S.C. § 216(b) .................................................................................................20

**Other Authorities**

29 C.F.R. § 541.100 ...............................................................................................18

29 C.F.R. § 541.102 ......................................................................................4, 18, 19

29 C.F.R. § 541.105 ...............................................................................................18

29 C.F.R. § 541.106 .....................................................................................19, 20, 28

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

29 C.F.R. § 541.2 .................................................................................................20

29 C.F.R. § 541.200 .............................................................................................19

29 C.F.R. § 541.700 .................................................................................19, 24, 28

29 C.F.R. § 541.708 .............................................................................................19

Fed. R. Evid. 801 .................................................................................................25

## I.      INTRODUCTION

In their Motion for Court Authorized Notice ("Motion"), the five named Plaintiffs, Ashleigh Mason, Dan Morse, Ryan Carroll, Osagie Ehigie, and Travis Streeter, and thirteen opt-in Plaintiffs (collectively "Plaintiffs"), incorrectly claim they were misclassified as exempt from overtime provisions of the Fair Labor Standards Act ("FLSA"). Their supporting evidence consists of declarations from Store Managers ("SMs") and Store Managers-In-Training ("SMITS") who worked at a comparatively trivial number of stores owned by Defendant Lumber Liquidators, Inc. ("LL") nationwide, and whose testimony is rife with conclusory, unsupported allegations. Plaintiffs cannot establish a basis to conditionally certify a ***nationwide*** collective of almost ***one thousand*** disparate current and former SMs and SMITs at ***400-plus locations*** across the country based on these declarations for several dispositive reasons.

First, Plaintiffs cannot certify a collective of either SMs or SMITs outside of New York because this Court does not have personal jurisdiction over them pursuant to the Supreme Court's guidance in *Bristol Myers Squibb v. Sup. Ct. of Cal.*, 137 S. Ct. 1773, 1784 (2017).

Second, to obtain an SM nationwide conditional certification and court-authorized notice, Plaintiffs must establish, through actual evidence (*not* unsupported assertions), that they are "similarly situated" such that they and the rest of the almost one thousand putative collective members "together were the victims of a common policy or plan that violated the law." *Myers v. Hertz*, 624 F.3d 537, 555 (2d Cir. 2010). In other words, Plaintiffs have to demonstrate a single uniform *unlawful* policy or practice.  Plaintiffs, however, have not done so. There is no uniform *unlawful* policy or practice that would make conditional certification appropriate.

Instead, all Plaintiffs have offered is anecdotal evidence that they – for whatever reason – allegedly *deviated* from the duties expected of them by LL (as set forth in their job description). When compared to declarations obtained by LL, it is clear that different SMs perform different

job duties that go to the heart of the exemptions analysis, and therefore cannot possibly be lumped together in one collective action for summary adjudication.

Finally, the purported collective action that Plaintiffs propose would be entirely unmanageable. Courts have recognized that the individualized assessment of the actual duties an employee performs to determine whether the executive, administrative, and/or combination exemptions apply make conditional certification wholly inappropriate in misclassification cases like the one here.

Plaintiffs' Motion must be denied and the Court should not authorize any notice to the purported nationwide collective.

## II.   STATEMENT OF FACTS

### A.   LL's Business And Store Management Structure

LL is a leading national provider of high-quality, affordable flooring. (Declaration of James Dyer In Support of Defendant's Opposition to Plaintiff's Motion for Court Authorized Notice ("Dyer Decl.") ¶ 2.) The Company is incorporated in Delaware and has its principal place of business in Toano, Virginia. (*Id.* ¶ 31-32.) LL sells flooring products, including pre-finished and unfinished hardwood, laminate and other types of flooring. (*Id.* ¶ 3.) Nationwide, LL's retail stores are organized into four sales divisions (North, South, East, and West). (*Id.* ¶ 4.) Each division is organized into approximately 5-7 regions, each of which is overseen by a Regional Manager ("RM"). (*Id.* ¶ 5.)  There are currently twenty-five RM positions in the United States and each RM oversees 15-20 stores.  (*Id.* ¶ 6.)

Each retail store is headed by one SM who is expected to actively manage the daily operations of their individual store. (*Id.* ¶ 7.) All SMs oversee two or more employees as follows: Assistant Store Manager I ("ASM I"), Assistant Store Manager II ("ASM II"), and/or other hourly associates as needed. (*Id.* ¶ 8.)  SMITs are typically hired for a training period not to

exceed 90 days, during which time they practice the tasks and responsibilities of an SM, under guidance of an SM, before transitioning to being fully responsible for their own store.  (*Id.* ¶ 9.)

**B.**     **The Actual Duties And Time Spent Performing Different Duties Vary Significantly Among SMs Based On Numerous Different Factors**

SMs manage the daily operations of their store and are ultimately responsible for the financial success of a multi-million dollar annual business. (*Id.* ¶ 11; *see, e.g.,* Collins Decl. ¶¶ 3, 8, 21; McMahon Decl. ¶¶ 4, 16, 25; Williams Decl. ¶¶ 10, 21, 26; McCarthy Decl. ¶¶ 5, 8, 18.)[1] LL expects SMs to, among other things, recruit, hire and develop employees to meet operating and sales goals; manage daily operations; supervise, train, and discipline employees when appropriate; review and analyze sales and other financial reports; and implement store policies and procedures. (Dyer Decl. ¶ 12.) As demonstrated below, however, the duties actually performed and time spent on them varies widely among SMs, as is the nature of such a position in a retail environment.  (*Id.* ¶ 13.)

**1.**     **LL's Expectations as to SMs' Job Duties**

LL's expectations of SMs are described in its SM job description, and all of these duties focus on the primary *managerial* and *administrative* responsibility of SMs:

- Set expectations and provide leadership, coaching and oversight for a team of sales and sales support associates dedicated to driving revenues and committed to providing outstanding customer service.

- Manage the daily operation of a store including but not limited to; sales, gross margin, customer service, safety, inventory control, expense management, merchandising, promotional events, training, associate relations, scheduling, opening/closing, alarm response, cash management, SAP, and facility maintenance.

- Achieve sales plans, gross margin, inventory, profitability goals as well as all operational standards.

---

[1] *See* Declaration of Christine L. Hogan In Support Of Defendant's Opposition to Plaintiff's Motion For Court Authorized Notice ("Hogan Decl."). All SM declarations will be attached to the Hogan Decl. as exhibits, and will be cited as "[Name] Decl. ¶ __, **Ex.** __".  Every declaration submitted in support of this Opposition is from an SM who worked in at least one LL store with less than $5 million in revenue per year.  (Dyer Decl. ¶ 10.)

- Staff the store to the approved staffing matrix. Recruit, hire and develop an outstanding sales and service focused staff to meet Company operating and sales objectives. Work with associates to create training and development plans, identify career opportunities and maintain a store staff succession plan.

- Establish personal and individual associate sales goals and set performance expectations for each associate. Review results and provide feedback and coaching on a daily basis to ensure success.

- Address all store performance management and associate relations issues in a timely and effective manner.

- Set the standard for customer service provided by associates and focus on driving associates' sales by ensuring they are embracing all sales processes, including Pro-Sales, Installations and the *"Journey"*.

- Timely and accurate completion of all required reports, paperwork and maintain accurate financial records (e.g. reconcile daily cash report). Ensure/verify completion of daily bank deposits, audits and check sheets.

- Build productive, collaborative working relationships with the store team as well as with other Lumber Liquidators stores, third party vendors (installers) and corporate business partners.

- Resolve customer service issues and complaints in a timely manner to the satisfaction of the customer and to the benefit of the Company within the four-wall accountability; "Act like an Owner, Think like a Customer".

- Maintain operations by initiating, coordinating, and enforcing program, operational, and personnel policies and procedures. Conduct audits as required; take corrective and preventative action as necessary.

(Dyer Decl. ¶ 14, Ex. 1, p. 1-2.)

In other words, the duties listed in the job description include all of the classic indices of supervision and management, *see* 29 C.F.R. § 541.102, and LL intended its SMs to be properly classified as exempt. (*Id.* ¶ 15.)   Moreover, in actual practice, SMs perform the above listed managerial and administrative duties as well.   (Dyer Decl. ¶ 16; *see, e.g.,* Collins Decl. ¶¶ 4-25; McMahon Decl. ¶¶ 6-28; Williams Decl. ¶¶ 21-32; McCarthy Decl. ¶¶ 8-31; *see also* Point II.B.2.)[2]

---

[2] Contrary to Plaintiffs' assertion that "Defendant's corporate headquarters decides virtually every aspect of a store's operation" (Pl. Br. at 6), SMs are expected to exercise their independent discretion and judgment to run their stores like their own business and "act like an owner." (Dyer Decl. ¶ 17; *see also* Collins Decl. ¶¶ 8-20; McMahon Decl. ¶¶ 16-24; Williams Decl. ¶¶ 21-27; McCarthy Decl. ¶¶ 8-13, 18-19.)

## 2.   SMs' Job Duties Vary Based on a Variety of Unique Factors

The actual combination of duties performed – and time spent on different duties – varies widely among SMs. (Dyer Decl. ¶ 18.) This is plainly evident when comparing the declarations submitted by Plaintiffs[3] and LL in conjunction with this Motion and analyzing whether certain exemptions are met.[4]  With respect to the executive exemption:

- **Primary duty of management.**  SMs Angenent, Blehm, White, Caracciolo, Dimos, Griffin, Rudkowski, Williams McMahon, Collins and McCarthy all testify that their primary duty is managing their stores.[5] SMs Schlueter, Dixon, Mason, Richard, Lane, Flores, Portis, Kapsidelis, Streeter, Flood, Morse, Becerra, Chilcote, Ehigie, Carroll, Van Vorhis, and Harmon allege that management was not their primary duty.[6]

- **Directing 2+ employees.**  SMs Angenent, Blehm, White, Caracciolo, Dimos, Griffin, Rudkowski, Williams, McMahon, Collins, and McCarthy all testify that they direct and supervise associates.[7] Plaintiffs' SM declarants were silent with respect to directing and supervising associates.

- **Hiring.**  SMs Angenent, Blehm, White, Caracciolo, McMahon, Collins, Griffin, McCarthy, Van Vorhis, and Harmon testify that they materially participate in the hiring process.  SMs Schlueter, Dixon, Mason, Richard, Lane, Flores, Portis, Kapsidelis, Streeter, Flood, Morse, Carroll, Becerra, Chilcote, and Ehigie allege that they did not.[8]

With respect to the administrative exemption:

- **Primary duty of performing non-manual work directly related to management or general business operations.**  SMs Angenent, Blehm, White, Caracciolo, Dimos, Griffin, Rudkowski, Williams, McMahon, Collins, and McCarthy all testify that their

---

[3] LL explicitly reserves the right to challenge the veracity of Plaintiffs' declarations in later proceedings.

[4] Plaintiffs do not claim that the SMs did not meet the salary basis test.

[5] Angenent Decl. ¶¶ 6, 8, **Ex.** 1; Blehm Decl. ¶¶ 6, 8, **Ex.** 2; White Decl. ¶¶ 7, **Ex.** 3; Caracciolo Decl. ¶¶ 6, 8, **Ex.** 4; Dimos Decl. ¶¶ 5, 7, **Ex.** 6; Griffin Decl. ¶¶ 5, 7, **Ex.** 11; Rudkowski Decl. ¶¶ 5, 7, **Ex.** 20; Williams Decl. ¶¶ 21-27, 30-32, **Ex.** 22; McMahon Decl. ¶¶ 16-28, **Ex.** 18; Collins Decl. ¶¶ 8-14, **Ex.** 5; McCarthy Decl. ¶¶ 7-13, **Ex.** 17.

[6] Schlueter Decl. ¶¶ 8-10; Dixon Decl. ¶¶ 9-11; Mason Decl. ¶¶ 9-11; Richard Decl. ¶¶ 8-10; Lane Decl. ¶¶ 9-11; Flores Decl. ¶¶ 9-10; Portis Decl. ¶¶ 14-16; Kapsidelis Decl. ¶¶ 9-11; Streeter Decl. ¶¶ 16-18; Flood Decl. ¶¶ 9-11; Morse Decl. ¶¶ 10-12; Becerra Decl. ¶¶ 11-13; Chilcote Decl. ¶¶ 11-14; Ehigie Decl. ¶¶ 8-10; Carroll Decl. ¶¶ 8-10; Van Vorhis Decl. ¶¶ 9-11; Harmon Decl. ¶¶ 8-10 (all attached as exhibits to the Marino Decl.).

[7] Angenent Decl. ¶ 7, **Ex.** 1; Blehm Decl. ¶ 7, **Ex.** 2; White Decl. ¶ 6, **Ex.** 3; Caracciolo Decl. ¶ 7, **Ex.** 4; Dimos Decl. ¶ 6, **Ex.** 6; Griffin Decl. ¶ 6, **Ex.** 11; Rudkowski Decl. ¶ 6, **Ex.** 20; Williams Decl. ¶¶ 23, 27, 30-31, **Ex.** 22; McMahon Decl. ¶¶ 6-15, **Ex.** 18; Collins Decl. ¶¶ 12-14, **Ex.** 5; McCarthy Decl. ¶¶ 14-17, **Ex.** 17.

[8] Schlueter Decl. ¶ 10; Dixon Decl. ¶ 11; Mason Decl. ¶ 11; Richard Decl. ¶ 10; Lane Decl. ¶ 11; Flores Decl. ¶ 10; Portis Decl. ¶ 16; Kapsidelis Decl. ¶ 11; Streeter Decl. ¶ 18; Flood Decl. ¶ 11; Morse Decl. ¶ 12; Carroll Decl. ¶ 10; Becerra Decl. ¶ 13; Chilcote Decl. ¶ 14; and Ehigie Decl. ¶ 10 (all attached as exhibits to the Marino Decl.).

primary duty is to perform non-manual work related to management or general business operations.[9]  SMs Schlueter, Dixon, Mason, Richard, Lane, Flores, Portis, Kapsidelis, Streeter, Flood, Morse, Becerra, Chilcote, Ehigie, Carroll, Van Vorhis, and Harmon allege that their primary duty was manual work.[10]

- **Exercising discretion and independent judgment.**  SMs Angenent, Blehm, White, Caracciolo, Dimos, Griffin, Rudkowski, Williams, McMahon, Collins, McCarthy, Van Vorhis, and Harmon all testify that they exercise discretion and independent judgment with respect to matters of significance.[11]  SMs Schlueter, Dixon, Mason, Richard, Lane, Flores, Portis, Kapsidelis, Streeter, Flood, Morse, Carroll, Becerra, Chilcote, Ehigie, however, claim that they did not.[12]

Finally, based on the analysis above, SMs Angenent, Blehm, White, Caricciolo, Dimos, Griffin, Rudkowski, Williams, McMahon, Collins, McCarthy[13] – are exempt under the combination exemption.

Some of the reasons for these differences are highlighted below.

### a. Differences In Store Location and Sales Volume Affect Staffing Needs

First, there are material differences that stem from the specific retail store to which an

---

[9] Angenent Decl. ¶¶ 6, 8, **Ex. 1**; Blehm Decl. ¶¶ 6, 8, **Ex. 2**; White Decl. ¶ 7, **Ex. 3**; Caracciolo Decl. ¶¶ 6, 8, **Ex. 4**; Dimos Decl. ¶¶ 5, 7, **Ex. 6**; Griffin Decl. ¶¶ 5, 7, **Ex. 11**; Rudkowski Decl. ¶¶ 5, 7, **Ex. 20**; Williams Decl. ¶¶ 21-27, 30-32, **Ex. 22**; McMahon Decl. ¶¶ 16-28, **Ex. 18**; Collins Decl. ¶¶ 8-14, **Ex. 5**; McCarthy Decl. ¶¶ 7-13, **Ex. 17**.

[10] Schlueter Decl. ¶¶ 8-10; Dixon Decl. ¶¶ 9-11; Mason Decl. ¶¶ 9-11; Richard Decl. ¶¶ 8-10; Lane Decl. ¶¶ 9-11; Flores Decl. ¶¶ 9-10; Portis Decl. ¶¶ 14-16; Kapsidelis Decl. ¶¶ 9-11; Streeter Decl. ¶¶ 16-18; Flood Decl. ¶¶ 9-11; Morse Decl. ¶¶ 10-12; Becerra Decl. ¶¶ 11-13; Chilcote Decl. ¶¶ 11-14; Carroll Decl. ¶¶ 8-10; Van Vorhis Decl. ¶¶ 9-11; Harmon Decl. ¶¶ 8-10 (all attached as exhibits to the Marino Decl.).

[11] Angenent Decl. ¶¶ 7,8, **Ex.  1**; Blehm Decl. ¶¶ 7, 8, **Ex. 2**; White Decl. ¶ 7, **Ex. 3**; Caracciolo Decl. ¶¶  7, 8, **Ex. 4**; Dimos Decl. ¶¶ 6, 7, **Ex. 6**; Griffin Decl. ¶¶ 6, 7, **Ex. 11**; Rudkowski Decl. ¶¶ 6, 7, **Ex. 20**; Williams Decl. ¶¶ 21-32, **Ex. 22**; McMahon Decl. ¶¶ 7-28, **Ex. 18**; Collins Decl. ¶¶ 6-8, 10-13, 18-20, 21, 23-24, **Ex. 5**; McCarthy Decl. ¶¶ 7-18, 20, **Ex. 17**; Van Vorhis Decl. ¶¶ 10-11; Harmon Decl. ¶¶  9,10.

[12] Schlueter Decl. ¶¶ 8-10; Dixon Decl. ¶¶ 8-11; Mason Decl. ¶¶ 9-11; Richard Decl. ¶¶ 8-10; Lane Decl. ¶¶ 9-11; Flores Decl. ¶¶ 9-10; Portis Decl. ¶¶ 14-16; Kapsidelis Decl. ¶¶ 9-11; Streeter Decl. ¶¶ 16-18; Flood Decl. ¶¶ 9-11; Morse Decl. ¶¶ 10-12; Carroll Decl. ¶¶ 8-10; Becerra Decl. ¶¶ 11-13; Chilcote Decl. ¶¶ 11-14; Ehigie Decl. ¶¶ 8-10 (all attached as exhibits to the Marino Decl.).

[13] Plaintiffs' declarants, Van Vorhis and Harmon, may actually also meet the combination exemption because: (1) they participated in the hiring process and made recommendations regarding prospective applicants, which is an element of the executive exemption (*see* Van Vorhis Decl. ¶ 11; Harmon Decl. ¶ 10) and (2) they exercised discretion and independent judgment with matters of significance, in performing management duties, as they indicated that they reached out to potential customers to drive up sales on behalf of their individual stores and offered their own judgment concerning the hiring and firing of employees (*see* Van Vorhis Decl. ¶¶ 10-11; Harmon Decl. ¶¶  9,10).

6

SM is assigned, which affect the exemption analysis.  (Dyer Decl. ¶ 19.)  Some stores are isolated destination stores in industrial areas, while others are located in commercial areas and receive more foot traffic. (*Id.* ¶ 20.)  Some stores have no local competition, while other stores have multiple direct competitors within walking distance. (*Id.* ¶ 21.)  These differences influence staffing numbers and how SMs spend their time on a daily basis.  (*Id.* ¶ 22; *see also* McMahon Decl. ¶ 12, **Ex.** 18 ("[T]he staffing level of each store is uniquely set by the needs of the business – there isn't a 'one size fits all' model.").)

For example, SM Scott McMahon notes that his current location "at Store 1069 in Pittsburgh, Pennsylvania . . . has a much larger sales volume than [his former] Lancaster store." (McMahon Decl. ¶ 4, **Ex.** 18.) Consequently, McMahon "currently [has] four full-time non-exempt employees reporting to [him]: an ASM1, ASM2, and two Product Specialists, whereas as the Store Manager of the Lancaster store, [he] had only an ASM1 and an ASM2 reporting to him." (*Id.* ¶ 12; *see also* McCarthy Decl. ¶ 5, **Ex.** 17 (testifying that the "Nashua store is much larger than the Lebanon store – about $5 million in sales versus $2 million" requiring him to supervise a larger staff of "four full-time and one part-time employee").)

Likewise, Justin White, now a RM, but formerly an SM, attests that he "regularly supervised 3, 5, and 8 employees at the three locations where [he] was a store manager" depending on sales volume and location. (White Decl. ¶ 6, **Ex.** 3.) Benjamin Collins, an SM in Byron, Georgia testifies that "[w]hen [he] started as the Store Manager in Byron, there were two full-time employees working under [him]." (Collins Decl. ¶ 4, **Ex.** 5.) Given the Byron, Georgia store's success under his leadership, "in 2016, [its] staffing level increased . . . [and Collins] was able to hire a Warehouse and Sales Associate to join [his] team of ASM 1 and ASM 2." (*Id.*; *see also* Griffin Decl. ¶¶ 6, 7a, **Ex.** 11 (attesting to "hiring a fourth, full-time employee" to service

7

increased store volume).)

On the other end of the spectrum, Plaintiffs' declarant, SM Nick Flores of the State College, Pennsylvania store, testified that his "store generated about $100,000-$125,000 in revenue per month" and as a result, there were "at most, two non-exempt employees that worked" there. (Flores Decl. ¶ 4.)  Similarly, SM Vince Harmon of the Topeka, Kansas store noted that his "store generated roughly $110,000 in revenue per month" and the store was staffed "with one SM, and two non-exempt associates." (Harmon Decl. ¶ 4.)

As the above testimony illustrates, the store location impacts sales volume, which varies the number of employees any given SM supervises and contributes to SMs not having "a typical schedule, since [they] respond to the needs of [their] store." (McMahon Decl. ¶ 14, **Ex.** 18.) Further, sales volume influences many other factors, such as the frequency of customer interactions, the number of deliveries, and the amount of inventory to manage, which in turn influence an SM's duties and working time. (Dyer Decl. ¶ 23.)  In short, managerial duties are not "one size fits all" – rather they vary widely across locations and are different for each, individual SM.

### b.    SMs' Varying Management Styles and Focus

Second, the management style of the SM him/herself can also have a material effect on the exemptions analysis, since management style impacts the amount of time an SM spends on particular duties. (Dyer Decl. ¶ 24.)

For example, SMs with prior retail experience and knowledge of sales/financial reporting tend to spend significantly more time reviewing and analyzing store financials and considering store profitability as their primary responsibility. (Dyer Decl. ¶ 25.)  SM McMahon notes that he regularly studies the "monthly Four Wall report, which breaks down all sales and expense numbers . . . [to ensure they] are on track to meet [their] annual goals."  (McMahon Decl. ¶ 25,

Ex. 18.) Likewise, Michael Gasparre, SM at the West Allis, Wisconsin store, attests that he is "responsible for meeting . . . financial targets and [is] evaluated on whether the store meets the financial goals, not on whether he personally makes sales." (Gasparre Decl. ¶ 8f, Ex. 10.) SM Collins testifies that he is "always thinking about different ways to maximize sales." (Collins Decl. ¶ 13, Ex. 5.)

In contrast, other SMs, such as North Charleston, South Carolina SM Barry Dudley, focus on training subordinates on "sales and customer service techniques . . . [and] conducting one on one training meetings with the employees," which he believes is the core of his managerial focus. (Dudley Decl. ¶ 6, Ex. 8.) Alan Rudkowski, SM at the Cleveland, Ohio store focuses on tailoring his "training to each individual, depending on their background and level of experience." (Rudkowski Decl. ¶ 8c, Ex. 20; see also Lammers Decl. ¶ 8j, Ex. 15 ("[F]or some employees, I provide hands-on training; for others I may coach employees by role-playing"); Hauver Decl. ¶ 8c, Ex. 12 ("I tailor my training to each individual, depending on their background and level of experience in a similar setting."); Dimos Decl. ¶ 8c, Ex. 6 ("I adapt my training techniques to match the learning styles of my employees.").)

Still other SMs direct a significant part of their working energy to interviewing and developing staff. (See, e.g., Collins Decl. ¶¶ 6-7, Ex. 5 (testifying that he sometimes interviews "as many as 10-15 people to fill a position," that he has "100% control over who is interviewed and who is hired," and that each hire [he] make[s] is strategic and done for a particular reason to help [his] business.").)

In contrast, according to Plaintiffs' declarants, they have absolutely no managerial skills or styles to speak of. (See, e.g., Schlueter Decl. ¶¶ 9-10, 14; Dixon Decl. ¶ 11; Mason Decl. ¶¶ 11-13; Richard Decl. ¶ 10; Lane Decl. ¶ 11; Flores Decl. ¶¶ 3, 10, 12-13; Portis Decl. ¶ 16;

Kapsidelis Decl. ¶ 11;  Streeter Decl. ¶ 18;  Flood Decl. ¶ 11;  Morse Decl. ¶¶ 3, 12, 14-15;

Becerra Decl. ¶ 13;  Chilcote Decl. ¶ 14; Ehigie Decl. ¶ 10; Carroll Decl. ¶ 10; Van Vorhis Decl.

¶ 11; Harmon Decl. ¶ 10.)

The list goes on.  Where one SM could be properly exempt under the administrative

exemption, others could be properly exempt under the executive exemption, just based on that

particular SM's management style (or lack thereof).  Still others – allegedly, according to

Plaintiffs) – are not exempt at all.

### c.    Varying Skill Levels, Backgrounds, and Need For Discipline of Employees Affect SMs' Duties

Third, the skill levels and backgrounds, and thus varying needs for discipline of an SM's

subordinates, also significantly impact an SM's day-to-day duties and work time.

For example, some SMs attest to having to place a particular employee on a performance

improvement plan or to discipline him/her for substandard job performance.  (*See, e.g.*, Gasparre

Decl. ¶ 8i, **Ex.** 10 (noting that he has "the authority to place a store employee on an improvement

plan for continued performance issues"); Shank Decl. ¶ 8i, **Ex.** 21 (testifying that he advised "an

employee that had an attendance problem . . . how to improve his performance by laying out

particular expectations" but also noting that the employee was "eventually disciplined and

terminated for failure to follow the performance plan."); Polk Decl. ¶ 8i, **Ex.** 19 (attesting that

she "provided an employee with attendance issues with verbal and written warnings . . . [t]hat

process resolved the attendance issue").)

Other SMs noted that a material part of their job duties included recommending

termination of employees for misconduct, such as stealing company property and inventory.

(*See, e.g.*, Caracciolo Decl. ¶ 8b, **Ex.** 4 (noting that in his tenure as SM he has "had to terminate

one employee . . . [and] it was [his] decision although [he] ran it by [his] Regional Manager as a

courtesy to him"); Rudkowski Decl. ¶ 7b, **Ex.** 20 (explaining that "[a]lthough my recommendations are reviewed by my Regional Manager and Human Resources, my recommendations are always followed.").)

In stark contrast, there are Plaintiffs who have disclaimed *any* responsibility for disciplining or terminating hourly employees. *See, e.g.*, Schlueter Decl. ¶10; Dixon Decl. ¶ 11; Mason Decl. ¶ 11; Richard Decl. ¶ 10; Lane Decl. ¶ 11; Flores Decl. ¶ 10; Portis Decl. ¶ 16; Kapsidelis Decl. ¶ 11; Streeter Decl. ¶ 18; Flood Decl. ¶ 11; Morse Decl. ¶ 12; Becerra Decl. ¶ 13; Chilcote Decl. ¶ 14; Bodnar Decl. ¶ 7; Ehigie Decl. ¶ 10; Carroll Decl. ¶ 10; Van Vorhis Decl. ¶ 11; Harmon Decl. ¶ 10.

A particular SM's duties with respect to discipline and termination could make or break his/her meeting the executive exemption's elements.

### d.     Different Store Layout, Design and SMs' Discretion

Fourth, according to Plaintiffs, "Defendant's corporate headquarters decides virtually every aspect of . . . the store layout." (Pl. Br. at 6.) This may be the case for the Opt-In Plaintiffs' stores, but in reality, store layout varies widely.

For example, some stores are smaller and/or lack a warehouse, which leads certain SMs to spend more time managing inventory. (Dyer Decl. ¶ 26; *see also* Shank Decl. ¶ 7, Ex. 21 (explaining that his three employees assist him "with unloading trucks, working on updating flooring displays, store maintenance and upkeep, inventory and the like" but he still exercises his own judgment on how to run the store and delegate the tasks at hand).)  Other stores, however, house a robust warehouse with significantly more warehouse employees, which required those SMs to expend most of their working time on staff supervision and management.  (Dyer Decl. ¶ 27; *see also* Collins Decl. ¶ 17, **Ex.** 5 ("My store lay-out is 100% up to me. This includes the warehouse, back office, and sales floor.  I also set the procedures for how our employees should

handle customers and sales.  Over the years, I have made changes to these processes to improve our business."); McCarthy Decl. ¶ 11, **Ex.** 17 ("About 90-100% of my job involves working with my team as their supervisor.").)  For example, SM McMahon attests that he has full authority and discretion to control his store's inventory and strategically locate better selling product within his store. (McMahon Decl. ¶ 26, **Ex.** 18.)

These declarations contrast directly with the Opt-In Plaintiffs' declarations, where many have claimed that LL has a strict requirement regarding planograms, sales promotions and advertisements, pricing changes, etc., which give them no discretion with respect to store operations management.  (*See, e.g.*, Schlueter Decl. ¶¶ 5, 8, 9; Dixon Decl. ¶ 9; Richard Decl. ¶¶ 5, 8; Lane Decl. ¶¶ 6, 9; Flores Decl. ¶¶ 5, 9; Portis Decl. ¶¶ 9, 12,14; Kapsidelis Decl. ¶¶ 5, 9; Flood Decl. ¶¶ 5, 9; Becerra Decl. ¶ 11; Chilcote Decl. ¶¶ 6, 11; Bodnar Decl. ¶ 6; Van Vorhis Decl. ¶¶ 6, 9; Harmon Decl. ¶ 8.)  This is part of the reason why – according to Plaintiffs – they are not exempt from overtime, whereas LL's submitted declarations demonstrate that its SMs are, in fact, properly exempt under the executive and administrative exemptions.

### e.    Varying Levels Of Supervision By The Regional Manager

Fifth, the level of supervision and management style of the RM directly impacts an SM's independence, duties, and working time. (Dyer Decl. ¶ 28.)  Some RMs allow SMs great latitude and discretion in executing their management duties; whereas other RMs work more collaboratively with each individual SM in fulfilling management duties. (*Id.* ¶ 29; *compare* McMahon Decl. ¶ 5, **Ex.** 18 ("My current Regional Manager visits my store approximately once per month, and I sometimes partner with him by phone, but he trusts my judgment in running the store so his involvement is quite limited.") *with* Flores Decl. ¶ 10 ("My [RM] micromanaged every aspect [of] my job, which necessarily eliminated or minimized any managerial functions I might perform.")

For example, SM Rudkowski attests that he initiates "mid-year informal reviews of all employees, which [he] handle[s] independently, with no oversight by [his] Regional Manager." (Rudkowski Decl. ¶ 8k, **Ex.** 20.) SM Collins has had a different experience: while "the drafting or revising of the [employees'] reviews . . . are completely up to [him]," they "are reviewed by [his] Regional Manager, Chris Hannan." (SM Collins Decl. ¶ 13, **Ex.** 5.) Certain Opt-In Plaintiffs have allegedly had a different experience. (*See, e.g.*, Portis Decl. ¶¶ 1, 9, 16; Kapsidelis Decl. ¶¶ 5, 11.)

The same differential with respect to RM involvement is seen with respect to hiring decisions as well. (*Compare* Collins Decl. ¶ 5, **Ex.** 5 (as the SM, "[w]hen I have to hire someone, I review applications in the Dayforce system, and choose a few people for interviews. Sometimes I interview as many as 10-15 people to fill a position; sometimes it only takes a few interviews to find a good fit. I have *100%* control who is interviewed and who is hired.") (emphasis added) *with* Harmon Decl. ¶ 10 ("any hiring and/or firing had to go through [the RM] and [the RM] did not considering [the SM's] recommendations as to hiring or firing, but made his decisions independently.").)

Simply put, an RM's involvement and the extent to which s/he takes on duties that are meant for the SM, can take an SM from exempt to non-exempt under the executive exemption.

### f.    Special Assignments Or Roles For Certain SMs Within LL

Finally, some SMs have unique duties that may change the ways in which they meet the various elements of the exemptions.  (Dyer Decl. ¶ 30.)

For example, some SMs are responsible for district or region-wide training.  (*See, e.g.*, McCarthy Decl. ¶¶ 16-17, **Ex.** 17.) Others assist with special projects, such as managing store turnarounds, which address issues with inventory or negative customer feedback at individual locations. (*Id.* ¶ 4 (attesting to his special assignment at the Lebanon store, which was struggling,

"commut[ing] one hour to the store to help turn it around.").) Still others are responsible for opening new stores, where they will continue as the SM. (Kirby Decl. ¶ 3, **Ex.** 13.)

Finally, some SMs take initiative and harness their own individual savvy with social media to create ad-hoc ads promoting store sales and recruiting potential new hires. (McCarthy Decl. ¶ 8, **Ex.** 17 ("As a Store Manager, I consider the store my business.  I am willing to go above and beyond what any hourly employee does for the good of the store.  For example, I frequently post things on Facebook or Craigslist to promote the store, certain sales, or when we're looking for staff. Some of those posts I create myself, some are shared from Lumber Liquidators' page, or from posts by other Store Managers in the area.").)  Unique job duties make these SMs not similarly situated to their SM peers.

In sum, the combined testimony of 22 SMs from 30 different locations across more than 15 different states directly contradicts Plaintiffs' allegations of top-down corporate control. (Pl. Br. at 6-8.)

## III.    LEGAL ARGUMENT – THRESHOLD ISSUE

As a threshold matter, Plaintiffs' Motion for court authorized notice on a *nationwide* basis suffers from a fatal flaw: this Court does not have personal jurisdiction over the SMs, SMITs, or any other putative collective members who did not work in the state of New York. Plaintiffs' Motion should be denied as to out-of-state Plaintiffs and collective members on this basis alone.

Personal jurisdiction consists of two types: general and specific jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014). "With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" *Id.* at 137 (*citing Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915 (2011)).  LL is

incorporated in the state of Delaware and its principal place of business is Toana, Virginia (Dyer Decl. ¶¶ 31-32), so the paradigm bases of general jurisdiction do not exist here.

The Second Circuit recently affirmed that "when a corporation is neither incorporated nor maintains its principal place of business in a state, mere contacts, no matter how 'systematic and continuous,' are extraordinarily unlikely to add up to an "exceptional case" supporting exercise of general jurisdiction." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir. 2016) (*citing Daimler*, 571 U.S at 160, n.19). In examining a company's contacts within a state:

> [Courts] must assess the company's local activity not in isolation, but *in the context of the company's overall activity:* the general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts, but calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide.

*Brown*, 814 F.3d at 629. *See also Maclin v. Reliable Reports of Texas, Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018) ("Maintaining extensive operations within a state alone does not satisfy the general-jurisdiction exception."). Here, the instant action is not the "exceptional case" supporting exercise of general jurisdiction.

While LL may have 21 locations in the state of New York, it maintains *400-plus locations* across the country. (Form 10-Q, Marino Decl. Ex. 6, ECF No. 42-6.) That's only approximately 5 percent of stores nationwide. As stated by the Supreme Court and quoted by the Second Circuit, a "corporation 'that operates in many places can scarcely be deemed at home in all of them.'" *Brown*, 814 F.3d at 629 (quoting *Daimler,* 571 U.S. at 160 n.20)). Such is the case here. LL's New York contacts do not make this an "exceptional case," and general personal jurisdiction does not exist.

Accordingly, the analysis moves to whether this Court has specific jurisdiction. "Specific jurisdiction is available when the cause of action sued upon arises out of the defendant's

activities in a state." *Brown*, 814 F.3d at 624.  LL does not dispute that specific personal jurisdiction exists with respect to the Named and Opt-in Plaintiffs who worked in New York; rather, the Company asserts that this Court does not have specific personal jurisdiction over the claims of the Named and Opt-in Plaintiffs who worked ***outside of New York***, and thus a collective action with claims outside New York is simply not permitted.[14]

In the U.S. Supreme Court's recent decision in *Bristol Myers Squibb v. Sup. Ct. of Cal.*, 137 S. Ct. 1773, 1784 (2017), the Supreme Court "held that a state court lacked specific jurisdiction under the Fourteenth Amendment because there was no connection between the out-of-state defendant's contacts and the out-of-state plaintiffs' claims." *Gazzillo v. Ply Gem Indus., Inc.*, 2018 WL 5253050, at *7 (N.D.N.Y. Oct. 22, 2018) (citation omitted).  Although, in *Bristol-Myers*, the Supreme Court explicitly left open whether the same logic would extend to federal courts under the Fifth Amendment, 137 S. Ct. at 1783-84, federal courts in this jurisdiction have found that "*Bristol-Myers Squibb* is instructive" in ruling that they "do[] not have jurisdiction over [] out-of-state Plaintiffs' claims." *Gazzillo*, 2018 WL 5253050, at *7 (dismissing the complaint because plaintiff neither pled sufficient contacts with New York nor a connection between the non-New York plaintiff's claims and the state); *see also Spratley v. FCA US LLC*, 2017 WL 4023348, *7 (N.D.N.Y. Sept. 12, 2017) (same); *Sae Han Sheet Co. v. Eastman Chem. Corp.*, 2017 WL 4769394, at *8 (S.D.N.Y. Oct. 19, 2017) (same).[15]

---

[14] The burden is on Plaintiffs to prove specific jurisdiction. *See Maclin*, 314 F. Supp. 3d at 848 ("When personal jurisdiction is challenged, the plaintiff bears the burden of proving that personal jurisdiction exists.").

[15] Plaintiffs may "attempt to side-step the due process holdings in *Bristol-Myers* by arguing that the case has no effect on the law in class actions because the case before the Supreme Court was not a class action." *In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115, at *8–9 (E.D.N.Y. Sept. 20, 2017). However, Judge Cogan of this Court held that the "constitutional requirements of due process does not wax and wane when the complaint is individual or on behalf of a class. . . . [p]ersonal jurisdiction in class actions must comport with due process just the same as any other case." *Id.*

This legal principle is no less applicable in the context of a collective action like this one. In *Roy v. Fedex Ground Package Sys.*, 2018 WL 6179504, at *8 (D. Mass. Nov. 27, 2018), the court denied collective certification of out-of-state claims.  There, the court stated:

> District courts generally have extended the specific jurisdiction principles articulated in *Bristol-Myers* to the analysis of personal jurisdiction over named plaintiffs in federal class actions. . . .
> . . .
> [Moreover, i]n the court's view, an analysis of the similarities between the nonresident party plaintiffs in *Bristol-Myers*, the out-of-forum named plaintiffs in Rule 23 class actions, and the nonresident opt-in plaintiffs in FLSA suits supports FedEx Ground's position that, even if the principles stated in *Bristol-Myers* do not extend to class members in class actions, ***they preclude this court from asserting personal jurisdiction over the claims of potential opt-in plaintiffs who do not work for FedEx Ground in Massachusetts***.

*Id.* at *5 (emphasis added).  *See also Am.'s Health & Resource Ctr., Ltd. v Promologics, Inc.*, 2018 WL 3474444, at *4 (N.D. Ill. July 19, 2018) (granting defendant's motion to strike class claims because in "this class action, the *Bristol Myers* opinion is applicable and its import clear: The Court lacks jurisdiction over the Defendants as to the claims of the nonresident, proposed class members").

Because no specific personal jurisdiction exists over the eleven Plaintiffs who never worked for LL in New York[16] – both SMs <u>and</u> SMITs alike – their claims should be dismissed and the court should deny the authorization of notice to them or any other out-of-state, putative members.

## IV.   LEGAL ARGUMENT – SIMILARLY SITUATED

Assuming, *arguendo*, that the Court does not deny nationwide conditional certification in light of the Supreme Court's guidance in *Bristol Myers*, the Court should still deny conditional

---

[16] Of the 5 Named Plaintiffs and 13 Opt-In Plaintiffs here, 61% never worked for LL in the State of New York: Daniel Schlueter (NJ); John Dixon (TX); Steve Lane (LA); Nick Flores (OH, PA); Christopher Portis (UT, NV); Nick Kapsidelis (TX, AK); Travis Streeter (CO); Linda Chilcote (MD); Nereda Bodnar (CO); Jefferson Van Vorhis (CA); and Vince Harmon (KS).

certification of the SM putative collective in full. The widely divergent SM testimony supports LL's argument that the almost 1,000 current and former SMs that Plaintiffs seek to represent are simply not similarly situated to justify conditionally certifying a New York collective, much less a *nationwide* collective. Based on the testimony of SMs cited above, Plaintiffs' motion for conditional certification and court authorized notice should be denied, or alternatively, limited only to the New York stores where the four original named Plaintiffs worked.[17]

A.  **The Exemption Questions at Issue in this Case Are Complex and Require an Investigation Into the Applicable Regulations and SMs' Actual Job Duties**

Before examining the relevant standard applied in a motion for conditional certification, it is essential to understand the exemptions at issue here.  LL maintains that the SMs are properly classified as exempt pursuant to the executive exemption, administrative exemption, and/or a combination of these exemptions. The determination of whether a particular SM is classified properly, much less an entire collective, is a complex endeavor requiring the assessment of many factors because there are many ways that SMs could be exempt under the law.

An SM can be properly classified as exempt solely under the executive exemption, if they: (1) have management as their primary duty, (2) customarily and regularly direct the work of two or more employees, (3) have the authority to hire or fire other employees, or their suggestions as to the change in status of other employees are given particular weight,[18] and (4) they are compensated on a salary basis. 29 C.F.R. § 541.100(a).  Furthermore, for an SM to have "management" as their "primary duty" pursuant to 29 C.F.R. § 541.102, their work could consist

---

[17] The original four named Plaintiffs all exclusively worked in New York: Ashleigh Mason (Staten Island, NY), Dan Morse (Brooklyn, NY), Ryan Carroll (Brooklyn, NY), and Osagie Ehigie (Yonkers, NY). (Pl. Br. at 3.)

[18] In order to determine whether an employee's suggestion to hire or fire is given "particular weight," the regulations direct courts to consider the frequency in which an employee makes or is asked to make suggestions and the frequency with which those suggestions are relied upon, along with whether it is one of the employee's job duties to make such suggestions.  *See* 29 C.F.R. § 541.105.  "An employee's suggestions may still be deemed to carry 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision."  *Id.*

of any number of at least 15 discrete work activities.[19]

In addition, an SM could be properly exempt solely under the administrative exemption if they meet a separate three-part test: (1) have the performance of office or non-manual field work, directly related to management policies or general operations, as their primary duty, (2) customarily and regularly exercise discretion, and (3) meet the salary basis test. 29 C.F.R. § 541.200(a).

Next, an SM can also be properly classified as exempt, pursuant to 29 C.F.R. § 541.708, if they perform "a combination of exempt duties" set forth in the executive and administrative exemption tests. Consequently, an SM whose primary duty is "management" (an executive exemption element), who customarily and regularly exercise his discretion (an administrative exemption element), and who meets the salary test (which applies to both), can be properly classified as exempt. Likewise, an SM whose primary duty is office work directly related to LL's general operations (an administrative exemption element), who supervises at least two employees and materially participates in the hiring process (executive exemption elements), and who meets the salary test (which applies to both), can also be properly classified as exempt.

As a final matter, an SM can also be properly classified as exempt even if s/he performs both exempt *and* nonexempt work, and, further, even if he spends more than fifty percent of his time doing nonexempt work. *See* 29 C.F.R. § 541.106(a), 541.700(b). Accordingly, an SM can spend a significant amount of his time doing certain nonexempt tasks like manual labor, for

---

[19] They include, but are not limited to, "activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures." 29 C.F.R. § 541.102.

example, and *still* qualify as exempt.[20]   The salient point is that **any combination of duties, exempt and/or non-exempt,** can potentially make an employee exempt from the FLSA's overtime requirements.   The possible permutations of duties in this regard are considerable.

It is for this reason that the *type* of evidence used to establish the exemptions is particularly important in misclassification cases.   "Significantly, the regulations make clear that these questions should be resolved by examining the employees' actual job characteristics and duties." *Myers*, 624 F.3d at 548 (citing 29 C.F.R. § 541.2).   As the Second Circuit has instructed, deciding whether a plaintiff is "denied overtime," i.e., was misclassified, "is a complex, disputed issue, *and its resolution turns on exemption,* which in turn will require the district court to *decide a number of subsidiary questions* involving whether plaintiffs fall within the Labor Department's criteria."   *Id.* at 548 (emphasis added).   This is the legal framework under which collective certification must be analyzed.

**B.**     **<u>Conditional Certification and Court Authorized Notice Is Discretionary And Should Only Be Granted In "Appropriate" Cases</u>**

The FLSA does not expressly authorize "judicial notice." Rather, "district courts 'have discretion, *in appropriate cases*, to implement [§ 216(b)] . . . by facilitating notice," even though they "are not *required* to do so by [the] FLSA." *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (citation omitted) (emphasis added). District courts may only conditionally certify a collective action and facilitate notice where the plaintiffs prove they are "similarly situated" to those they seek to represent. *Id*; 29 U.S.C. § 216(b). While the FLSA does not define what it means to be "similarly situated," district courts in New York have adopted a "two-step"

---

[20] In fact, the regulation uses the following example, which involves a retail manager like those at issue here: "For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. An assistant manager can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves."  29 C.F.R. § 541.106(a).

approach. *Prizmic v. Armour, Inc.*, 2006 WL 1662614, at *2 (E.D.N.Y. June 12, 2006).

The first stage, which is now before the Court, is referred to as the "notice stage." Before a district court can authorize notice, a plaintiff must "make a 'modest factual showing' that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law.'" *Myers*, 624 F.3d at 555 (citations omitted). The Second Circuit cautioned, however, that although this "should remain a low standard of proof," the required factual showing "cannot be satisfied simply by 'unsupported assertions.'" *Id.* "[C]ertification is not automatic." *Romero v. H.B. Auto. Grp., Inc.*, 2012 U.S. Dist. LEXIS 61151, at *27 (S.D.N.Y. May 1, 2012).

To make a proper showing, "plaintiffs can rely on the pleadings, but only as supplemented by other evidence, such as affidavits from named plaintiffs, opt-in plaintiffs, or other putative collective action members." *Lin v. Benihana Nat'l Corp.*, 755 F. Supp. 2d 504, 509 (S.D.N.Y. 2010). However, "the plaintiff's supporting allegations *must be specific, not conclusory*." *Id.* (internal citations omitted) (emphasis added).

Moreover, Plaintiffs must demonstrate that they and the SMs they seek to represent are similarly situated with respect to common *unlawful* practices – as opposed to common practices, generally. *Myers*, 624 F.3d at 555. In other words, Plaintiffs must provide the Court with an "identifiable *factual* nexus which binds [plaintiffs] and potential class members together as victims of particular *illegal* practices." *Ahmed v. T.J. Maxx Corp.*, 2014 U.S. Dist. LEXIS 138240, at *7 (E.D.N.Y. Sept. 24, 2014) (emphasis added).

Here, Plaintiffs fail to demonstrate that they and others were similarly situated with respect to their performance of similar job duties, which contradicted their exempt status and which were indicative of a common illegal policy. As explained below, the Court must deny conditional certification for this reason.  *See Ahmed*, 2014 U.S. Dist. LEXIS 138240, at *5

(denying conditional certification where named plaintiff failed to present sufficient evidence that members of the proposed collective were similarly situated to him with respect to the performance of non-managerial duties).

### 1. Lawful Uniform Policies Do Not Support the Grant of Conditional Certification

As an initial matter, it is well-settled that the mere fact that all employees in a single job position are classified as exempt is not germane to the determination of whether they are similarly situated. *See Myers*, 2007 WL 2126264, at *5 (noting that plaintiff's argument that the categorization of all managers as exempt renders all collective members similarly situated is "superficial"; and noting that proof of liability "will not turn on what [defendant] did or did not do vis-à-vis the entire class, but rather what *each member* of the class does on a daily basis.").

Similarly, simply having the same operational practices – when they do not reflect an unlawful common practice – is also insufficient to support a finding that all collective members are similarly situated. *See Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469 (S.D.N.Y. 2010) (the existence of standardized operational procedures, management program, policies, and an identical hierarchal management structure "does little to add to the inference that [store managers] nationwide were similarly situated to [plaintiff] with respect to his claim that he was required to spend a majority of his time performing non-exempt tasks"); *Jenkins v. TJX Co. Inc.*, 853 F. Supp. 2d 317, 321 (E.D.N.Y. 2012) (holding that plaintiff's evidence of uniform formal policies, job description, and training materials is insufficient to support conditional certification).

Plaintiff claims that "Defendant's own job description for the SMs demonstrates that they are expected to work in excess of fifty hours and perform a substantial amount of non-exempt duties." (Pl. Br. at 21). This statement, however, is belied by the job description itself. Even a cursory reading reveals that the job description describes duties that focus on the primary *managerial* and

*administrative* responsibility of SMs. (Dyer Decl. ¶ 14, Ex. 1.)

The Plaintiffs' reliance on a single reference to SMs "[p]eriodically" rearranging there schedule due to business needs, including to "address store staffing gaps" is a red herring. (*Id.*) This simply demonstrates that SMs are ultimately responsible for store scheduling (an element of the executive exemption) and must always ensure that their stores are fully staffed. Accordingly, the job description is not evidence of a common unlawful practice of misclassification either. *See Khan v. Airport Mgmt. Servs., LLC*, 2011 WL 5597371, at *4 (S.D.N.Y. Nov. 16, 2011) (where a plaintiff does not attack the job description itself but instead alleges that employees "were not given duties in conformity with these policies … 'it is not sufficient for [plaintiff] to show that he and the proposed class operated under the same job description'" (citations omitted)).

Simply put, there is no common unlawful policy or practice here that would support collective certification.

### 2.   Plaintiffs' Declarations Also Fail To Show That They And All Other Putative Collective Members Are Similarly Situated

Without evidence of a common unlawful policy, Plaintiffs have no choice but to attempt to rely on their eighteen declarations to provide supposed evidence of a nationwide, systemic "practice of misclassifying SMs." (Pl. Br. at 21.)  In this jurisdiction, however, it is well-settled that anecdotal evidence of a small percentage of putative collective members is insufficient to warrant nationwide conditional certification in a misclassification case.  *See Diaz v. Electronics Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382 at *13-14 (W.D.N.Y. Oct. 13, 2005) (denying conditional certification of a nationwide collective of store managers because "[a] although SMs share the same job description, their responsibilities, in fact, may differ and thus a highly fact-specific and detailed analysis of each SM's duties is required, making class treatment

inappropriate"); *Ahmed*, 2013 U.S. Dist. LEXIS 81942, at *36 (rejecting "the argument that a plaintiff need only show that he performed tasks in contravention of a common legal policy" by performing non-exempt tasks to be "entitled to approval of a collective action for all employees of that business"); *c.f. Zheng v. Good Fortune Supermarket Grp. (USA), Inc.*, 2013 U.S. Dist. LEXIS 130673, at *14, 18-20 (E.D.N.Y. Sept. 12, 2013) (Mann, J.) (denying conditional certification because plaintiff put forth "insufficient evidence of a common policy or plan").

Even if this Court were to consider Plaintiffs' declarations, however, they would still be insufficient to grant conditional certification.

As an initial matter, Plaintiffs' declarations largely focus on their allegation that they spent a majority of their time performing manual labor. (*See, e.g.*, Schlueter Decl. ¶¶ 8, 10-12, 14; Dixon Decl. ¶¶ 9, 11-13,16; Mason Decl. ¶¶ 9-10, 12-13; Ehigie Decl. ¶¶ 8-9, 10-12.) In a retail setting, however, DOL regulations provide that SMs may have management as their primary duty "even if the [SMs] spend more than 50 percent of the time performing nonexempt work such as running the cash register." *See* 29 C.F.R. § 541.700(c). The fact that an SM does mostly manual work might make or break classification, depending on the particular facts. Plaintiffs' declarants may be properly classified – just like LL's declarants. Only an individualized inquiry will determine proper exemption status, which is why collective certification is inappropriate.

Second, Plaintiffs' declarations devote an entire section called "Similarly Situated Employees," where they attempt to get into evidence the alleged statements and experiences of others. These sections should be disregarded as they "contain nothing more than conclusory statements and hearsay that are insufficient to establish that Plaintiffs are similarly situated to other employees." *See Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 356 (S.D.N.Y. 2008) (conditionally certifying employees at the store where plaintiffs worked, but declining to

24

certify employees at five other stores where the evidence relating to those five stores amounted to hearsay statements"); *Barfield v. New York City Health & Hospitals Corp.,* 2005 U.S. Dist. LEXIS 28884, *3 (S.D.N.Y. Nov. 18, 2005) (denying certification where plaintiff provided "nothing but limited anecdotal hearsay to suggest that there is widespread practice").[21]

Finally, a comparison of Plaintiffs and LL's declarations show significantly conflicting testimony with respect to duties *that go to the heart of the executive and administrative exemptions*: the management of the store, supervision and direction of employees, use of discretion, participation in the hiring process, assisting his/her RM, participation in the termination process, the discipline of employees, the training of employees, and other aspects of store operations.

For example, certain SMs testified that they regularly and customarily decide: how to coach, train and direct employees (*see* Dudley Decl. ¶ 6, **Ex.** 8; Rudkowski Decl. ¶ 8c, **Ex.** 20; Lammers Decl. ¶ 8j, **Ex.** 15; Dimos Decl. ¶ 8c, **Ex.** 6); how to staff the store (*see* McMahon Decl. ¶¶ 4, 12, **Ex.** 18; McCarthy Decl. ¶ 5, **Ex.** 17; White Decl. ¶ 6, **Ex.** 3; Collins Decl. ¶ 4, **Ex.** 5; Griffin Decl. ¶¶ 6-7, **Ex.** 11); who to recruit, interview, hire and promote (*see* Collins Decl. ¶¶ 6-7, **Ex.** 5; Gasparre Decl. ¶ 8a, **Ex.** 10; McMahon Decl. ¶¶ 9-10, **Ex.** 18; Griffin Decl. ¶ 7a, **Ex.** 11); when and why to discipline and/or terminate employees (*see* Gasparre Decl. ¶ 8i, **Ex.** 10; Shank Decl. ¶ 8i, **Ex.** 21; Caracciolo Decl. ¶ 8b, **Ex.** 4; Rudkowski Decl. ¶ 8b, **Ex.** 20; Polk Decl. ¶ 8i, **Ex.** 19; McCarthy Decl. ¶ 12; Dimos Decl. ¶ 8i, **Ex.** 6); how best to merchandise/display products (*see* Collins Decl. ¶ 17, **Ex.** 5; McMahon Decl. ¶ 26, **Ex.** 18); when to order more or different products and inventory (*see* McMahon Decl. ¶ 26, **Ex.** 18); how best to address

---

[21] Plaintiffs also include impermissible hearsay from the internet (Marino Decl. Ex. 25, "Excerpts of Glassdoor.com Reviews") as part of their so-called evidence in support of conditional certification. This must be disregarded as well. *See Novak v. Tucows, Inc.,* 2007 WL 922306, at *5 (E.D.N.Y. Mar. 26, 2007), *aff'd,* 330 F. App'x 204 (2d Cir. 2009) ("Where postings from internet websites are not statements made by declarants . . .[and] are offered to prove the truth of the matter asserted, such postings generally constitute hearsay under Fed. R. Evid. 801.").

customer disputes (*see* Caracciolo Decl. ¶ 8g, **Ex.** 4; McMahon Decl. ¶ 22, **Ex.** 18; Griffin Decl. ¶ 7f, **Ex.** 11; Kmetz Decl. ¶ 8g, **Ex.** 14); and creative ways to grow the business and increase sales (*see* Gasparre Decl. ¶ 8f, **Ex.** 10; Collins Decl. ¶ 13, **Ex.** 5; McMahon Decl. ¶ 25, **Ex.** 18.) Other SMs also testified that they routinely exercise their own judgment about pricing and discounts, whether to approve out-of-policy returns and refunds, and other related decisions. (McMahon Decl. ¶ 26, **Ex.** 18.)

In contrast – in declarations that are fairly uniform in nature – Plaintiffs testified that they did not have management as their primary duty, meaningfully participate in hiring, firing, or disciplinary decisions, spend time working on administrative tasks, or use any discretion or independent judgment in performing their duties. (*See, e.g.*, Schlueter Decl. ¶¶ 5, 8-10, 14; Dixon Decl. ¶¶ 7, 11; Mason Decl. ¶¶ 7, 11; Richard Decl. ¶¶ 5, 10; Lane Decl. ¶¶ 6, 11; Flores Decl. ¶ 5, 10; Portis Decl. ¶¶ 12, 16, 18; Kapsidelis Decl. ¶¶ 7, 11; Streeter Decl. ¶¶ 12, 18, 20; Flood Decl. ¶¶ 7, 11; Morse Decl. ¶¶ 8, 12; Becerra Decl. ¶¶ 9, 13; Chilcote Decl. ¶¶ 9, 14; Bodnar Decl. ¶7; Ehigie Decl. ¶¶ 5, 10; Carroll Decl. ¶¶ 5, 10; Van Vorhis Decl. ¶¶ 6, 11; Harmon Decl. ¶¶ 7, 10.)

Tellingly, the significant differences in duties and experiences are observed even when comparing declarants *who worked within the same state*. For example, in New York, an SM of the Albany store, Luke Griffin, testified that: (1) "he constantly exercised [his] own judgment on how to run the store and supervise [his] employees, including what tasks should be delegated" to other employees (Griffin Decl. ¶ 6, **Ex.** 11); (2) "[a]s a SM, the main purpose of [his]  job is to manage all aspects of the store," including employees and sales (*Id.* ¶ 5); (3) he interviewed employees and made recommendations regarding termination, which was followed by the Company and the employee was ultimately terminated (*Id.* ¶ 7a, b); (4) "[i]t's his job to drive

sales and also manage within the store's operating budget" (*Id.* ¶ 7f); and (5) he uses his "discretion and judgment to determine what products should or should not be carried on our store." (*Id.* ¶ 7k.)

In contrast, Staten Island SM Ashleigh Mason, one of the Named Plaintiffs, noted that: (1) "[t]here is no discretion in operating a store, as virtually every aspect of the business is dictated" by LL (Mason Decl. ¶ 7); (2) she spent "the most amount of [her] time providing routine customer service" (*Id.* ¶ 10); (3) she interviewed applicants in "limited circumstances" and did not comment whether she made any recommendations (*Id.* ¶11); (4) she had no "involvement in setting the labor budget of the store" (*Id.*); and (5) she had no discretion in "selecting what products to sell." (*Id.*)

Based on this brief comparison, SM Griffin is exempt under the executive, administrative, and combination exemptions, whereas SM Mason is alleging she is not exempt under those exemptions.[22]

The above evidence proves that the SM putative class members are simply not similarly situated to one another.  Instead, all that the Plaintiffs' evidence proves is that there may be a small number of SMs who – for whatever reason – could not or would not perform the type of managerial and administrative duties that they should have been performing. This is precisely the reason why collective certification is inappropriate. Deciding liability based on Plaintiffs' testimony alone would not reflect the reality of SMs nationwide.

### C.      Collective Adjudication Of the Applicable Exemptions To SMs Necessarily Involves Individualized Inquiries Rendering Collective Treatment Unmanageable And Inefficient

Even if the Court finds that Plaintiffs' unsupported assertions establish a violation of the

---

[22] A similar exercise can be taken with respect to other SMs in New York and SMs in other states.  *Compare* Andenent Decl. *with* Van Vorhis Decl. (both CA); McMahon Decl. *with* Flores Decl. (both PA); Griffin Decl. *with* Mason Decl., Richard Decl., Flood Decl., Morse Decl., Becerra Decl., Ehigie Decl., & Carroll Decl. (all NY).

FLSA with respect to them, and that they and almost 1,000 of SMs across the country are similarly situated (which they clearly are not), collective adjudication would be both unmanageable and inefficient. The only evidence in this case regarding the job duties performed by SMs demonstrates that the *actual daily tasks* each SM performs is widely divergent, and are based on idiosyncratic and individual factors that are the antithesis of being "similarly situated." *See* 29 C.F.R. § 541.700(a).

Simply put, the FLSA's recognition that exempt employees can concurrently perform managerial and non-managerial work without defeating the exemption requires a "case by case" inquiry into not only how much time an employee allegedly spends performing nonexempt tasks, but also an inquiry into whether such tasks were being performed concurrently with the performance of managerial/exempt duties, such as supervision, training, disciplining or directing the work of other employees. 29 C.F.R. § 541.106(a).  Again, this makes collective treatment ineffective, inefficient, and unmanageable. Therefore, "a court must [] take a measured approach when addressing a request for collective action certification, mindful of the potential burden associated with defending against an FLSA claim involving a broadly defined collective group of plaintiffs." *Ikikhueme v. CulinArt, Inc.*, 2013 U.S. Dist. LEXIS 77720 at **4-5 (S.D.N.Y. June 3, 2013).[23]

Where, as here, the proposed *nationwide* collective is the very antithesis of "efficient resolution in one proceeding," Plaintiffs' bid for conditional certification and authorized notice

---

[23] Similarly, considerations of time, cost, and efficient use of judicial resources weigh against "rubber-stamping" a plaintiff's proposed collective when that plaintiff has not presented sufficient evidence to justify the particular class he or she is seeking. Unwarranted conditional certification of a broad and ill-defined collective unnecessarily requires parties to engage in expensive discovery and briefing, resulting in extensive legal fees, only to have the collective decertified at a later stage in these proceedings. *See Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797 (S.D.N.Y. 2012), *adopted*, 2012 WL 2588771 (S.D.N.Y. July 2, 2012) (rejecting argument that "any over-inclusiveness in the scope of the collective action should be corrected during the second stage of review following conditional certification") (internal citations omitted).

must be denied. *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989).

## V.    ARGUMENT – FORM OF NOTICE

If the Court determines that Notice should be sent to potential collective members, it should be limited to the New York locations where the original four named Plaintiffs actually worked. *See, e.g.*, *Martin v. Sprint/United Mgmt. Co.*, 2016 WL 30334 at *8 (S.D.N.Y. Jan. 4, 2016) (certifying only collective at single location in New York due to plaintiffs' failure to show common corporate policy causing alleged harm "across a sprawling geographic area"); *Vasquez v. Vitamin Shoppe Indus. Inc.*, 2011 U.S. Dist. LEXIS 74376, at *3 (S.D.N.Y. July 11, 2011) (limiting notice to only 7 stores in Brooklyn and Manhattan because Plaintiff's evidentiary "submission . . . is entirely devoid of any evidence from which this Court could infer that all SMs, across 40 states, are misclassified").

Furthermore, LL should not be required to produce the private and personal information requested by Plaintiffs – other than mailing addresses and dates of employment. *See Michael v. Bloomberg L.P.*, 2015 WL 1810157, at *4 (S.D.N.Y. Apr. 17, 2015) ("And, at this early juncture – with no showing that many notices have been returned as undeliverable – [defendant] will not be required to post the collective action notice in the workplace, or to produce employees' social security numbers or dates of birth."); *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 324 (S.D.N.Y. 2007) (denying plaintiff's request for "alternate addresses, telephone numbers, Social Security numbers, work locations and dates of employment").

In particular, the production of social security numbers is inappropriate at this stage and violates the privacy of putative collective members. *See Bloomberg,* 2015 WL 1810157, at *4 (no social security numbers); *Guan Ming Lin*, 755 F. Supp. 2d at 514–15 (denying production of social security numbers, even the last four digits, at it would unnecessarily violate the privacy rights of the employees); *Fa Ting Wang v. Empire State Auto Corp.*, 2015 WL 4603117, at *16

(E.D.N.Y. July 29, 2015) ("As to Social Security numbers, Plaintiff has not alleged any particular need for this sensitive information."). Similarly, telephone numbers are unnecessary given that Plaintiff's counsel should not be contacting prospective clients by telephone.

Further, Plaintiffs' omnibus request to post the notice, email the notice, create a website for electronic consent to join, *and* send notice by first-class mail should be rejected as duplicative, unreasonable and unnecessary. *See Gordon v. Kaleida Health*, 2009 U.S. Dist. LEXIS 95729, at *35 (W.D.N.Y. Oct. 14, 2009) (denying plaintiff's request to post, e-mail and publicize notice and opt-in forms because notice via first class mail was sufficient and more reliable); *Shajan v. Barolo, Ltd.*, 2010 WL 2218095, at *2 (S.D.N.Y. June 2, 2010) ("All current employees will be receiving the notice, there is no need to require defendants to post the notice in the workplace.").  LL likewise objects to the sending of reminder notices by email and first-class mail for the same reasons.

In this case, first-class mail more than suffices to provide notice and the opportunity to opt-in for any putative collective member. *See Hinterberger v. Catholic Health Sys.*, 2009 U.S. Dist. LEXIS 97944, at *40 (W.D.N.Y. Oct. 21, 2009) (recognizing that "notification by electronic mail could create risks of distortion or misleading notification through modification of the notice itself or the addition of commentary" and an email from an unfamiliar address may have a high likelihood of being trapped by an individual's email spam filter, therefore dissemination by U.S. Mail only was appropriate); *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 463 (E.D.N.Y. 2014) (no email).

Next, Plaintiff's request for a 90-day notice period far exceeds the typical 60-day period that courts in this jurisdiction allow. *See Yap v. Mooncake Foods Inc.*, 146 F. Supp. 3d 552, 566-67 (S.D.N.Y. Nov. 18, 2015) (observing that courts in the Second Circuit routinely restrict the

opt-in period to 60 days, especially when plaintiffs proffer no special circumstances warranting a longer opt-in period); *Kucker v. Petco Animal Supplies Stores, Inc.*, 2016 WL 237425, at *14 (S.D.N.Y. Jan. 19, 2016) ("Plaintiffs have not provided this Court with any authority for the proposition that the described characteristics of the proposed collective in this case give rise to any "special circumstance" that would warrant an extended opt-in period. . . . The majority, though, have limited opt-in periods to 60 days."); *Fa Ting Wang*, 2015 WL 4603117, at *11 (adopting report and recommendation and collecting cases where a 60–day opt-in period applies); *Diaz v. S & H Bondi's Dept. Store*, 2012 WL 137460, at *8 (S.D.N.Y. Jan. 18, 2012) (allowing only 60-day notice period).

Finally, the Consent Form itself should be aligned with the language in the Notice so that it's clear to putative collective members that they are only opting into the lawsuit with respect to their federal claims.  Accordingly, Consent Form should be entitled "Consent to Join Collective Action Lawsuit" and the acknowledgement language should be revised to state: "I consent to be a plaintiff . . . to contest the failure of Lumber Liquidators to pay me overtime wages under federal law and authorize the filing of this consent in this lawsuit challenging such conduct."  (ECF No. 42-30 (underline denoting revision).)

## VI.    CONCLUSION

For all the reasons stated above, Plaintiff's motion for conditional certification and court authorized notice should be denied with prejudice. Alternatively, if the Court deems notice appropriate, it should be geographically limited to LL's locations in New York and limited to a period of 60 days with the changes detailed in Point V.

Date:   November 30, 2018
        New York, New York

_____
Christine L. Hogan
clhogan@littler.com
Kevin K. Yam
kyam@littler.com
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

*Attorneys for Defendant Lumber Liquidators, Inc.*