1          UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF NEW YORK (BROOKLYN)

3   ASHLEIGH MASON, et al,
                                    Case No. 1:17-cv-04780-RLM
4              Plaintiffs,

5   v.                              Brooklyn, New York
                                    October 19, 2021
6   LUMBER LIQUIDATORS, INC.,       12:34 p.m.

7              Defendant.

8

9         TRANSCRIPT OF TELEPHONIC CONFERENCE HEARING
            BEFORE THE HONORABLE ROANNE L. MANN
                UNITED STATES MAGISTRATE JUDGE
10

    APPEARANCES:
11
    For the Plaintiffs:            Justin M. Swartz, Esq.
12                                 Outten & Golden LLP
                                   Outten 685 Third Avenue
13                                 Outten 25th floor
                                   Outten New York, NY 10017
14
                                   John R. Stevenson, Esq.
15                                 Justin R. Marino, Esq.
                                   Stevenson Marino, LLP
16                                 75 Maiden Lane
                                   Suite 402
17                                 New York, NY 10038

18  For the Defendant:            Kevin K. Yam, Esq.
                                   Littler Mendelson P.C.
19                                 900 Third Avenue
                                   New York, NY 10022
20
    Court Recorder:               Electronic Sound Recording
21
    Clerk:                        Josh Proujanksky
22

23

24

25

```
1    Transcription Service:        Chris Hwang
                                   Abba Reporting
2                                  PO Box 223282
                                   Chantilly, Virginia   20153
3                                  (518) 302-6772

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25
```

1

<u>**INDEX**</u>

2

3

<u>Page</u>

Motion, granted                                47

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to order at 12:34 p.m.)

2          THE COURT:  This is Judge Mann on the line.  I'm

3     conducting a telephonic hearing in Mason, et al v. Lumber

4     Liquidators, Incorporated, 17CV4780.  I hope everyone is safe

5     and healthy.

6          Who is on the line on behalf of the Plaintiffs?

7          MR. SWARTZ:  Good afternoon, Your Honor.  Justin

8     Swartz from Outten & Golden for the Plaintiffs.

9          THE COURT:  Good afternoon.  Anyone else?

10         MR. STEVENSON:  Good afternoon, Your Honor, this is

11    J.R. Stevenson of Stevenson Marino on behalf of the Plaintiffs.

12    And my colleague Justin Marino is also on the phone as well.

13         MR. MARINO:  Good afternoon.

14         THE COURT:  Good afternoon.  Anyone else for

15    Plaintiffs?

16         MR. STEVENSON:  That's all, Your Honor.

17         THE COURT:  All right, and who is on the line on

18    behalf of Defendant Lumber Liquidators?

19         MR. YAM:  Good afternoon, Your Honor, this is Kevin

20    Yam from Littler Mendelson on behalf of Defendant.

21         THE COURT:  Okay, and anyone else with you?

22         MR. YAM:  It would just be myself today.  Thank you.

23         THE COURT:  All right, I had -- the purpose of my

24    setting up this telephonic hearing was to address the parties'

25    dispute with respect to the proposed notice for the non opt-in

1    New York Plaintiffs.  I hope I got their labels correct.

2            And I wanted to hear from each side about why they

3    think I guess in the case of the Plaintiffs why this additional

4    information is appropriate?

5            MR. SWARTZ:  Thank you, Your Honor.  This is Justin

6    Swartz speaking.

7            THE COURT:  And obviously, I'll give Defendants an

8    opportunity to respond.

9            MR. YAM:  Thank you, Your Honor.

10           MR. SWARTZ:  This is Justin Swartz.

11           THE COURT:  All right, Mr. Swartz?

12           MR. SWARTZ:  Yeah, thank you, Your Honor, I

13   appreciate the opportunity.  I guess the first point we'd like

14   to make is that the purpose of FLSA notice is to give workers

15   whatever information is available that's accurate and could

16   help their decision in deciding whether to join a case.

17           Here, certainly accurate and certainly helpful to

18   workers to know that the case has settled of course pending

19   Court approval, but that the case had settled and that if they

20   joined the case, it's less likely than if this case hadn't

21   settled that they would have to participate in discovery, take

22   risks, have their name be in -- appear in transcripts, possibly

23   be deposed, all the things that often discourage workers from

24   joining -- many of the things that often discourage workers

25   from joining cases are not present here, or very unlikely to be

1    present if the settlement's approved.

2            And so, that's one reason.  Because obviously, I

3    think certainly appropriate to let people know that the case

4    has settled.

5            Moreover, it would be at least in our view misleading

6    to just send a regular settlement notice -- a regular opt-in

7    notice to workers without giving them the information.

8            And as far as the heart of the dispute, the amount

9    that the case has settled for and the amount that somebody is

10   entitled to if the settlement is approved, again, is absolutely

11   material to their decision about whether to join the case,

12   would need to negotiate the settlement with Defendants.  And if

13   the Court will remember, we negotiated a process where every

14   New York non opt-in would get paid.

15           And we were very pleased to have been able to

16   negotiate that because in, again in some cases, you know, as I

17   said before in some cases, not everybody gets paid because not

18   everybody returns a notice.  Here, we had dispensed with that

19   provision and conferred a benefit on this group.

20           And we'd like to retain as much of that benefit as

21   possible in the new process that we've negotiated, you know,

22   pursuant to the Court's concerns about the procedural aspects

23   of where we get premiums negotiated.

24           So giving people this information will make it more

25   likely that they'll join the case because awards in this case

1    are substantial.  We're not talking about small amounts and

2    somebody might look at it and throw the notice away.

3              And so, the fact that it makes it more likely that

4    people will join the case is our primary reason for seeking to

5    include information on the amount of the settlement.

6              Conversely, Defendants don't have a legitimate

7    interest in hiding any information from the Defendant -- from

8    the potential Plaintiffs.  And they don't have any interest

9    in -- any legitimate interest in (indiscernible) for two

10   reasons.

11             One, the FLSA should be construed in (indiscernible)

12   friendly way.

13             Two, they negotiated -- initially negotiated a

14   settlement where everybody would participate, everybody would

15   get paid.

16             And now, if we're not providing all the information

17   we can to help people make this decision, it's likely that

18   fewer than 100 percent of the people would join and that would

19   be a windfall for the Defendants compared to what they

20   initially negotiated.

21             And then, I'll just address quickly Defendant's point

22   that there's some unfairness with respect to these workers

23   compared to other workers.

24             Sometimes that's what happens when you send notices

25   at various times in a case to different groups of workers.

1   There's more information available sometimes than others.

2              And I think that, you know, Defendant's concern for

3   the other workers who didn't get a settlement notice and didn't

4   get a notice telling them that they would recover money, rings

5   hollow and certainly doesn't -- certainly doesn't advise

6   withholding information from these workers that would help them

7   make their decision.

8              THE COURT:  What are we -- you said that the amount

9   of money is significant.  Can you give me information on that?

10  And we're talking about -- is it about 55 individuals if I

11  recall correctly?

12             MR. SWARTZ:  I believe that's right.  And I don't

13  have the information for these particular individuals, but the

14  average gross settlement award in this case is about $20,000 if

15  the Court approves the case, the settlement.

16             So, you know, these are real numbers.  We're not

17  talking about, you know, a settlement where people are getting

18  $50 or a coupon for a hamburger.

19             I mean, these 20 -- you know, $20,000 average.  And

20  so, that's certainly something that people should know before

21  they decide whether to join the case or not.

22             THE COURT:  All right, anything you want to add

23  before I hear from Mr. Yam?

24             MR. SWARTZ:  Yeah, I guess the only last thing I'll

25  add is just -- and I'd just ask to respond to what Mr. Yam says

1    if there's a need to, but I do expect to Mr. Yam to raise the

2    legitimate point that there would be some need to

3    produce -- for the Defendant to produce data at least to be

4    able to allow us to estimate what the awards would be.

5             So that would certainly be a burden on the Defendant,

6    but I think it would be *de minimus* burden and certainly would

7    be outweighed by the benefit to the class to get this

8    information.

9             THE COURT:  I assumed -- I'm surprised to hear that

10   because I assumed all this information had already been

11   provided and the notices were ready to go, but for the

12   determination as to whether or not the amount should be

13   included or not.

14            MR. SWARTZ:  Uh --

15            MR. YAM:  May I respond or do you want Mr. Swartz to

16   continue?

17            MR. SWARTZ:  Sure.  I don't mind -- Your Honor, I

18   don't mind if Mr. Yam responds while I --

19            THE COURT:  Okay.

20            MR. SWARTZ:  -- try to address his question.

21            THE COURT:  All right, Mr. Yam?

22            MR. YAM:  Okay, with respect to the data, that

23   information has already been produced, but I believe Mr. Swartz

24   wants it in a more clean format, where we itemize specifically

25   the exact amount of weeks and for the non-exempts, for the

1    exempt work weeks.

2           And we're happy to provide that at a stage where, you

3    know, where we're about to send this out via the class

4    administrator, but we haven't actually been in communications

5    with the class administrator yet with respect to providing this

6    information.

7           And, you know, the settlement agreement provides that

8    we provide it two weeks after this agreement has been

9    permanently approved.

10          Now with respect to the -- the only disputes in the

11   notice, the opt-in notice, is primarily the individualized

12   settlement allocation.  And where it speaks to that is because

13   the proposed settlement has not been formally approved by this

14   Court yet.

15          And I believe Mr. Swartz is conflating two separate

16   documents.  The -- Exhibit B is the official court notice of

17   settlement and the opt-in notice.

18          And as Your Honor noted in the prior hearing, you

19   know, you envisioned a resolution where we have the opt-in

20   notice go to the New York non opt-ins first.  And then once

21   they have opted in, then the official Court notice goes out.

22          We believe that the individualized settlement

23   allocation should be in the official court notice of settlement

24   as opposed to the New York non opt-ins' opt-in notice.

25          And we believe that this New York's non opt-ins'

1    notice should really primarily follow the opt-in notice that

2    Your Honor granted approval of when you granted conditional

3    certification.

4         You know, in other words, you know, if the New York

5    non opt-ins were to receive the additional benefit of knowing

6    the estimated individualized settlement allocations before

7    opting in, it will be unfair to the rest of the opt-in

8    Plaintiffs who had already opted in, who didn't know what their

9    individualized settlement allocation were going to be, but they

10   opted in already.

11        So we believe that the same process should apply to

12   all opt-ins regardless of the stage of litigation that we're

13   currently in or what stage of litigation that the prior opt-ins

14   were currently in for fairness reasons.

15        MR. SWARTZ:  Your Honor, may I respond?

16        THE COURT:  All right.  Yes.

17        MR. SWARTZ:  Thank you, Your Honor.  Essentially,

18   what the Defendants are arguing is that there's a whole group

19   of people who didn't know that there was a settlement because

20   there wasn't one yet, but who actually did opt-in to the case.

21        And that, therefore, another group of people should

22   not know how much their settlement allocation is in order to

23   help them decide whether to opt-in to the case.

24        It doesn't prejudice that first group one bit because

25   those folks are already in the case and they're already

1   collecting a settlement amount.

2          And so, I just think it's a false comparison.

3   There's no reason to deny folks information that would help

4   them decide whether to join the case.

5          And, again, if they -- a few New York non opt-ins

6   just get a notice like was sent out during contested

7   litigation, the opt-in rate's going to be much lower.

8          People -- we know that the opt-in rate in contested

9   litigation is much lower than the opt-in rate as when somebody

10  gets a notice that says how much money they're going to get.

11         And, again, the Defendants did not have a legitimate

12  interest in -- even though that they would save money, they

13  don't have a legitimate interest in limiting participation,

14  again, for two reasons.

15         One, because the FLSA's an important statute and

16  people should be given every opportunity and -- to make good

17  decisions about joining a case.

18         But two, because they negotiated a process initially,

19  which again, the Court suggested that we revise, but they

20  initiated a process where everybody was going to get paid.

21         And now, they're arguing that the notice should be

22  issued in such a way that fewer people would get paid than the

23  way that we're seeking.

24         THE COURT:  I take it, it's been unspoken, but I take

25  it that any money that's left on the table if someone -- if one

1    of these non opt-in New York Plaintiffs declines for a second

2    time to opt-in, that money reverts back to the Defendant?

3            MR. SWARTZ:  That's correct, Your Honor.  And again,

4    we don't like reversionary processes if we can avoid them.

5    Sometimes we can't in order to get a deal done, but we prefer

6    not to.

7            In this case, again, we negotiated a process where a

8    check would go out to everybody.  And the reversion, if any,

9    would be miniscule because people cash checks.

10           And so, changing the process to a process where

11   people have to make a decision, take an action and then, later

12   get a check will decrease participation, but I understand the

13   Court's reasons for suggesting that and urging that, but that

14   would decrease their participation in itself.

15           I don't think in this case especially it's the right

16   thing to do, too, without any information that could keep

17   participation at a very high level.

18           THE COURT:  Well --

19           MR. YAM:  Your Honor?

20           THE COURT:  -- maybe the money shouldn't -- make it

21   shouldn't revert back.  Maybe it should go to those who opted

22   in originally, because you are talking about -- you're saying,

23   you know, now there's more information available.

24           So shouldn't this group have it when during the time

25   that the first wave of notices went out, that information was

1    available?

2          The fact of the matter is for I assume a large

3    proportion of these individuals, they got notice in the first

4    wave.

5          And without that information, they decided for

6    whatever reason, assuming they got it because they hadn't

7    moved, that they were not going to opt-in.  It wasn't worth it

8    to them.

9          So they are now being given a second chance.  So

10   where -- it -- to say that, well, this group is in a different

11   position than the earlier group is because now there's a

12   settlement and we know the amount, many of them were in that

13   first group and chose not to opt-in when they didn't have the

14   numbers.

15         MR. SWARTZ:  That's correct, Your Honor.  And I guess

16   it's just a matter of orientation.  I mean, we -- you know, we

17   see these New York non opt-ins as a -- in the sense a fresh

18   group of people.

19         I mean, yes, they chose not to opt-in when they got a

20   settlement notice that says that there's going to be a

21   litigation and, you know, just the possibility of them

22   participating and spending their time.

23         But you know, these are workers who didn't make a lot

24   of money and were -- they have the opportunity to get $20,000

25   on the average per person.

1          And I just -- you know, personally and you know as

2   Plaintiffs' team, we feel like it's very important to us to let

3   them know that we've negotiated this settlement for them, that

4   they can take advantage of and how much they're going to get.

5          I understand that other people didn't have that

6   opportunity.  And -- but that shouldn't take away from these

7   people getting that opportunity.

8          And as far as where the money goes, I mean, yes, it

9   would be great if we negotiated a settlement where any money

10  that was not claimed by the New York non opt-ins was somehow

11  divided up among other people, but you know, two things about

12  that.

13         One, we didn't negotiate that settlement.  And we

14  didn't think that -- we didn't think that it was a problem

15  because there was going to be such a miniscule reversion anyway

16  that it wasn't worth us blowing up a settlement over that term.

17         Again, because you know, we thought the checks were

18  going to go out the door.  99 or 95 percent of the checks are

19  usually cashed in these cases.  And so, it would have been such

20  a small amount that it was just not worth making an issue of

21  that term.

22         Now depending on what the Court rules on

23  this -- well, without regard to what the Court rules on this

24  notice, the participation is going to be lower to some extent.

25  I mean, I hope it's not much lower, but it might be.

1          And depending on what the Court rules in this

2     dispute, that will probably affect the participation rate as

3     well.

4          And the fact is we've, you know, we feel like the

5     amount that we negotiated for the rest of the cause members,

6     the people other than the New York non-opt-ins is good, fair,

7     very defensible.  In fact, we're very proud of the amount that

8     we negotiated for them.  $20,000 average is a lot.

9          And you know from our perspective, we prefer that

10    more people get to participate and more people do participate

11    and get their $20,000 average than bumping up everybody else's

12    settlement share by a small amount.

13         It means more to us for that to happen and that

14    comports with our view of what our job is as lawyers for a

15    class and a potential class.

16         THE COURT:  Well, you indicated that you

17    would -- your preference would be that the unclaimed funds

18    would not revert to the Defendants, but that's not what was

19    negotiated.

20         When you talk about the negotiations, are you talking

21    about the negotiations over the last couple of months?  Because

22    prior to that time, as I think both of you have pointed out,

23    you contemplated that the checks would just be sent to these

24    people regardless -- they wouldn't have to opt in.  The checks

25    would just be sent to them.  So the only unclaimed funds

1    presumably would be if someone had moved and there was no

2    forwarding address.

3              MR. SWARTZ:  That's correct or if somebody just for

4    whatever reason -- and from time to time, people don't cash a

5    check for -- some people don't believe in class actions or they

6    don't believe that they're entitled to money, so they don't

7    cash the check.

8              But yes, you're correct, and we expected that, you

9    know, 90 some -- possibly in the high 90's percentage of these

10   folks would have cashed the check.

11             And so, yes, some -- when I said that we negotiated a

12   process where there would be a reversion for unclaimed funds, I

13   was talking about the initial negotiation back when we mediated

14   the case.

15             And our thinking again was, okay, well, we'd rather

16   not have a reversion, but this is not something to either trade

17   something else for or blow up the deal because this reversion's

18   going to be miniscule.

19             We didn't revisit that term when we went back and

20   negotiated this revised settlement pursuant to the Court's

21   instructions at the last conference.

22             And I guess I'll just leave it at that.  I don't know

23   that -- I don't know whether we'd be -- we would have been

24   successful in doing that or not.  It's something for the

25   Defendants to address.

1        Certainly if the Defendants would give up their right

2    to any reversion, I mean, first of all, they probably would no

3    longer care what it said in the notice.

4        Maybe that that would resolve this dispute, but I'm

5    not sure that they're willing to do that, but that would be a

6    question for Mr. Yam and his client.

7        THE COURT:  Mr. Yam?

8        MR. YAM:  Your Honor, may I respond?

9        THE COURT:  Yes.

10        MR. YAM:  So in the scenario that Mr. Swartz

11    proposed, you know, we're talking about that the settlement

12    checks being sent out, in that scenario, the proposed

13    settlement would have already been approved by the Court.

14        But in this case, you know, with the New York non

15    opt-in -- non opt-ins' notice going out, you know, this

16    proposed settlement hadn't been formally approved or even

17    preliminarily approved yet.

18        So, you know, we want to, you know, address these

19    issues, you know, in order and not the cart before the horse.

20    So we would like to, you know, first have a definitive amount

21    of opt-ins in this case first and then have -- go through the

22    process with the Court in a fairness hearing.

23        And then, once these are -- everything's ruled by the

24    Court as fair and reasonable, then to have these checks go out

25    as Your Honor had mentioned at the prior hearing.

1          So we just want to follow the Court's orders.  And

2     that obviously was case law in this circuit in, you know, well,

3     it's been -- that Your Honor raised in the Allied Security case

4     and subsequent cases.

5          I actually have another case with Judge Bulsara and

6     this seems to be the order that he's following, as well as a

7     lot of other magistrate judges and district judges.

8          So we just want to make sure that, you know, all the

9     Plaintiffs' reasons are addressed.  And as Your Honor noted,

10    you know, a majority -- I don't have the exact number, but

11    there's probably 53 New York non opt-ins that's left over.

12         And I don't know the exact percentage, but more than

13    half probably have probably received the first opt-in notice,

14    and you know, for whatever reason, they did not join at that

15    time.  So to answer the question -- issue that Mr. Swartz

16    raised.

17              MR. SWARTZ:  Your Honor, this is --

18              THE COURT:  Well --

19              MR. SWARTZ:  -- Justin Swartz.  I'm sorry, go ahead.

20              THE COURT:  Go ahead.

21              MR. SWARTZ:  I'm sorry --

22              THE COURT:  No, you can go first.

23              MR. SWARTZ:  -- I was just going to say that -- yeah,

24    thank you, I appreciate it.  I was just going to say two

25    things.

1          One, that the fact that past people haven't received

2    notice at all is significant.  And I think that addresses at

3    least one of the points and --

4          MR. YAM:  I don't know the exact number, so don't

5    quote me on that.  I don't know the exact number of

6    (indiscernible).

7          MR. SWARTZ:  I understand.  I'm not --

8          MR. YAM:  Yeah.

9          MR. SWARTZ:  -- I'm not holding the Defendants to

10   that, but you know, some number close to that.  And it doesn't

11   make sense to send two different notices, one to somebody who

12   hadn't had a chance to join and one who had -- somebody who had

13   a chance to join with different levels of information in it.

14         But the second of all, you know, the fact that --

15         THE COURT:  Can I just -- can I just ask one thing?

16         MR. SWARTZ:  Of course.

17         THE COURT:  The ones who you say and whether it's

18   half or less than half, who haven't received notice at all, is

19   that because those are for the most part, those are more recent

20   hires?

21         MR. YAM:  No, it's actually earlier hires.  So

22   the -- this date, the period that we're contemplating for the

23   New York non opt-ins goes back to 2011.

24         THE COURT:  And the first notice that went out to New

25   York opt-ins, it went back to when?

 1            MR. MARINO:  2014.

 2            MR. YAM:  Yeah, 2014, three years prior to -- the

 3   complaint was filed sometime in 2017.

 4            THE COURT:  And just remind me, because I've been

 5   away from this case for two months.  I know you folks haven't,

 6   so it's fresh in your mind, but for those opt-ins from New York

 7   who opted in when the notice period went back to 2014, are

 8   there -- are they getting credit?

 9            Is the formula for what they are receiving under the

10   settlement agreement, are they getting credited for the weeks'

11   work that pre-date 2014?

12            MR. SWARTZ:  Mr. Stevenson?

13            MR. STEVENSON:  Yes.

14            MR. SWARTZ:  Do you want to take that?

15            THE COURT:  Please identify yourself.

16            MR. STEVENSON:  Yes, Your Honor, this is J.R.

17   Stevenson on behalf of Plaintiffs.  And yes, they are --

18            THE COURT:  Yeah.

19            MR. STEVENSON:  -- receiving credit for the time

20   period going back to 2011 or where they began to work for the

21   Defendant.

22            THE COURT:  So they are not -- this new group is not

23   getting the benefit of a calculation that takes into account

24   periods of time for which the original opt-ins did not get that

25   benefit?

1          MR. STEVENSON:  That's correct, Your Honor.

2          THE COURT:  So to the extent that the notice is being

3   sent out to individuals who would have not have received the

4   notice, the first notice that went out, it's because they are

5   not members of a FLSA collective?

6          MR. MARINO:  That's true for many of us.

7          MR. SWARTZ:  That's right.

8          THE COURT:  Who just said that?

9          MR. MARINO:  Excuse me, Justin Marino.

10         THE COURT:  Then, why are they getting an opt-in

11  notice?  I understand that the Defendant wants releases from

12  them, but they are not part of a FLSA collective.

13         And that just highlights the concern that I had, that

14  what we're really dealing with here is an end run around Rule

15  23.

16         These are not members of the collective because their

17  claims, for those who did not receive the earlier notice, they

18  don't have any FLSA claims.

19         MR. STEVENSON:  Your Honor, this is J.R. Stevenson on

20  behalf of Plaintiffs.  I think that they are members of an FLSA

21  collective.  I think the claims arise for the same reason that

22  the other individuals do under the FLSA.

23         I think that the Defendant has agreed to waive the

24  statute of limitations solely in the event that there is a

25  settlement to these individuals to seek, you know, to seek

1    relief on our behalf.

2            But I would think that there -- they are members of

3    an FLSA collective.  The Defendant would just normally have an

4    affirmative defense of the statute of limitations.

5            MR. MARINO:  And, Your Honor, this is Justin Marino.

6    If I can add to that?  A Rule 23 settlement typically envisions

7    the elimination of claims should those people fail to opt-out.

8            In this case, the release of claims only occurs in

9    the event that they affirmatively elect to participate in the

10   lawsuit.  So that is the key distinguishing feature.

11           THE COURT:  Mr. Yam, is the Defendant waiving the

12   statute of limitations, the FLSA statute of limitations on

13   these opt-ins?

14           MR. YAM:  I'm sorry, do you hear me?

15           THE COURT:  I didn't hear you.  I don't know if you

16   were on mute.

17           MR. YAM:  Oh, yeah, I must have been mute.  Can you

18   repeat that question again?  I'm sorry.

19           THE COURT:  Yes, the question was -- I stated my view

20   that from what I'm hearing, to the extent that an individual is

21   going to -- a New York employee or former employee, I guess it

22   would be a former employee, is receiving a notice for the first

23   time because their claims arose in the period between 2011 and

24   2014.

25           I stated that, therefore, they don't have any FLSA

1    claims and they're really not members of a FLSA collective.

2              And I believe it was Mr. Stevenson or Mr. Swartz said

3    that's not the case.  Well, one said -- one first acknowledged

4    that they're not members of the FLSA collective.

5              And then, another said they are, but the Defendant

6    has agreed to waive the statute of limitations, the FLSA

7    statute of limitations.

8              MR. YAM:  Okay, got that.

9              THE COURT:  So I'm asking.

10             MR. YAM:  Yes.  So in answer to --

11             THE COURT:  So I'm asking --

12             MR. YAM:  Sorry, go ahead.

13             THE COURT:  Go ahead.  No, if you understand the

14   question --

15             MR. YAM:  Yeah.

16             THE COURT:  -- go ahead and answer it.

17             MR. YAM:  Yes, I understand your question now.  So

18   the answer is not is not -- is, no, we do not waive the statute

19   of limitations, but we did agree to toll the statute of

20   limitations through a series of stipulations and even our

21   memorandum of understanding until the settlement papers were

22   filed.

23             Now I don't recall the exact tolling, how much time

24   has been tolled, but even in Your Honor's May 3rd, 2019 order,

25   you put in some footnotes, you know, how much time was tolled.

1    And subsequently after that, because the parties were

2    contemplating settlement, we entered into a series of

3    stipulations to toll the statute of limitations.  So the exact

4    amount of time that was tolled, I do not recall.

5    THE COURT:  Well, since the first notice went out --

6    that went out extended back to 2014, and I believe that notice

7    went out in around 2019, if I recall correctly, so I did take

8    into account tolling.  And it brought it back to 2014.

9    But now, we're talking about claims going back to

10   2011.  So I don't see how any tolling agreements would bring it

11   back before 2014.

12   MR. SWARTZ:  Your Honor, what there -- this is Justin

13   Swartz, if I may, a couple things.  One, what these folks are

14   releasing, it goes back to 2011, as you mentioned is not

15   just -- is not just their FLSA claims, but it's their state law

16   claims as well.  And those state law remedies overlap almost

17   identically with any FLSA remedies.

18   And so, it's true that some of them may be releasing

19   state law and remedies that reach farther back than the longest

20   possible reach back for their FLSA remedies.

21   But, again, these are -- I just -- to take a step

22   back from our perspective and I -- in this case, it aligns with

23   Defendant's perspective.

24   These are -- this is a benefit for the workers, these

25   people to be able to recover for a longer period than they

1    would likely be able to recover for a litigant.

2            And I say likely because they're definitely equitable

3    tolling arguments that they could raise.  And they could raise

4    those on an individual basis based on the case law with respect

5    to equitable tolling.

6            There could have been something the Defendant did to

7    obscure the violations something -- I mean, there's a whole lot

8    of case law on equitable tolling.

9            But -- and so, it's not -- these claims aren't

10   illusory.  I mean, they're probably not the strongest claims.

11   They're probably weaker claims for being able to recover on the

12   FLSA going back a longer period, but they still exist and it's

13   still something they're releasing.  And the parties have

14   negotiated a settlement where they get value for that.

15           In addition, they're releasing under state law

16   claims, which again, overlap almost identically with the FLSA

17   remedies.

18           And, you know, with respect to Rule 23, I don't want

19   to just leave that hanging, I mean, this is a discussion that

20   we asked the Court on the last conference as well.

21           I know that the Court has characterized this is an

22   end run on around Rule 23, but to what negative effect?  I

23   mean, that's -- the way that we look at it is that

24   these -- it's just like Mr. Marino said, these workers are

25   in -- we've negotiated a way that these workers would be in the

1  best possible situation, which is they don't release anything

2  unless they join the case.

3          And we didn't do a Rule 23 settlement because usually

4  courts look favorably on a settlement that give the workers the

5  choice of either releasing nothing and not participating or

6  releasing their claims and participating.

7          So, a worker, for instance, who doesn't get the

8  notice or a notice is misplaced, doesn't really say anything.

9  They're just not joining.

10          They won't -- they're not going to be harmed by the

11  wall to wall Rule 23 release.  The -- by operation of law,

12  they're only releasing claims that they joined.

13          And so, again, this is -- in this case, this is

14  consistent with Defendant interest, which the Court mentioned

15  and finality and peace in getting a release for their -- you

16  know, Defendant's paying money to settle this case, you know,

17  very good money in our view.

18          And they do have an interest.  And they've stated

19  that interest to us.  And it's obvious an interest in releasing

20  their -- getting releases for these folks that go all the way

21  back as far as they could possibly assert a claim even if it's

22  a claim based on equitable tolling.  And so, the interests are

23  aligned here.  And there's no harm to anybody.

24          There's no harm to -- I know usually Rule 23, you

25  know, Rule 23 protects defendants in a way because it gives

1    them finality, but it doesn't protect plaintiffs because it

2    releases claims for people who don't even -- didn't -- don't

3    get a notice or go do anything.

4              Here, you know, these workers are protected.  They

5    get to make the choice, release their claims and participate.

6    Or if they do nothing, they don't release anything.

7              And so, I mean, I get the -- I certainly get the

8    technical procedural point that this could also be done through

9    a Rule 23 settlement, but it's better for everybody for it not

10   to be here at least in our view.

11             THE COURT:  Well, it's not just technical, because

12   I'm taking an overview.  And the question is whether or

13   not --  it's -- well, you say no harm to everyone except that

14   these individuals are getting preferential treatment over and

15   above what the earlier opt-ins got.  And that is a concern to

16   the Court.

17             You know, you said, for example, that perhaps they're

18   didn't join because they didn't want to have to provide any

19   discovery.

20             Well, the earlier opt-ins decided that they were

21   going to take on that burden if they had to.  And except for

22   the named Plaintiffs, they didn't get any additional

23   compensation either for providing discovery or for assuming the

24   risk that they would have to provide discovery.

25             And now the Johnny-come-latelys are being given a

1   second chance, at least some of them are.  And others are being

2   given a chance who did not qualify, were not eligible for

3   opt-in notices in the first round.  And they're being given

4   this opportunity.  So they are advantaged over the earlier

5   opt-ins.

6        And this is not the only instance in this case in

7   which the Court, you know, taking a bird's eye view, not having

8   been involved in the weeds with these folks, looked at certain

9   aspects of the settlement and said I think that some of these

10  individuals are being overcompensated relative to others.

11       And the parties said that they would go back and fix

12  that.  And before we concluded today, I do want to talk with

13  you about the revised settlement agreement because I'd like to

14  see a redline or blacklined copy.

15       And I'd also -- and that can be sent to me through

16  chamber's email account, but I'd also like a -- an explanation

17  of what's been changed and how that addresses the issues that

18  the Court raised.

19       Because I looked very quickly, but none of that has

20  been explained to the Court or flagged for the Court.  So I

21  really want that addressed.

22       But in terms of -- I'd like to ask Mr. Yam a

23  question.  Let's put aside the monetary benefit to the

24  Defendant.

25       Let's assume no reversion to the Defendant if a check

1    is not cashed.  Would -- what would the Defendant's position be

2    with respect to the language in the notice?

3            MR. YAM:  About reversion?  What would happen to the

4    money if they -- if the person didn't opt-in?

5            THE COURT:  No, no, about whether or not the monetary

6    amount should be included?

7            MR. YAM:  Our whole point is that we do not think

8    that a monetary amount should be included in the court-

9    authorized notice to the opt-in -- New York non opt-ins.

10           THE COURT:  Well, I'm trying to tease out should

11   that -- should the money that is left on the table, should that

12   go to those who opted in earlier?

13           MR. YAM:  No, and I also have to bring that back to

14   my client.  I don't have any authority to say where it should

15   go because the contemplated settlement agreement is that, you

16   know, the money that's not -- that opt-ins do not take, it goes

17   back to Lumber Liquidators.  So, anything otherwise, I would

18   have to confer with my client.

19           THE COURT:  Well, isn't it true that the initial

20   settlement discussions, these individuals that we're now

21   talking about, the 53 or 55 --

22           MR. YAM:  Uh-huh.

23           THE COURT:  -- they were not going to have to opt-in.

24   They were just going to have checks sent to them?

25           MR. YAM:  Yes, but that's after the Court has

1    approved of the settlement.  And what we're doing now is we're

2    sending out opt-in notices first, before a proposed settlement

3    has been approved by the Court.

4           So the main problem with Defendant -- with the

5    current -- because the current dispute is that the agreement

6    has not been approved.

7           You know, and we're sending out opt-in notices to the

8    collective or purported collective or class with a number in

9    there.  And that's something we're not comfortable with.

10          If the Court had approved it, and you know, this is

11   this final number that goes out to the collective, then we'll

12   be fine with that.

13          Because you know, I have a couple of cases before

14   Magistrate Judge Bulsara.  And I believe in most of these

15   cases, you know, we have the opt-in notice go out first, and

16   then, people join.

17          And then, the Court holds a fairness hearing.  And

18   then, once the fairness hearing, you know, at the fairness

19   hearing when these -- when the final settlement amount is

20   approved, then the checks go out.

21          So we just want to -- you know, as Your Honor pointed

22   out the last court conference, we just want to make sure that

23   you know, the process is correct.

24          And you know, based on what we have before us right

25   now is Your Honor wants the opt-in notice to go out first, but

1    we think it's premature to include a settlement, an

2    individualized settlement amount in there if it hasn't even

3    been approved by the Court yet.

4              THE COURT:  What is the most recent case you have

5    with Judge Bulsara in which this kind of issue came up?

6              MR. YAM:  The most recent case I have is Hobbs v.

7    UPS.

8              THE COURT:  And do you have the docket number?

9              MR. YAM:  But it's not been approved yet.  It's just

10   we're going through the process, but we went through like four

11   settlement conferences and we were discussing the Allied

12   Security case.  And we're just going through, you know, the

13   process.

14             You know, it seems like there's this process we have

15   to follow where, you know, the opt-in notice goes out first.

16   Then there's the fairness hearing.

17             And once the fairness hearing is good, then the

18   checks go out because I believe in the Allied Security case,

19   you know, the checks had gone -- the parties had contemplated

20   the checks to go out, you know, as we had originally

21   contemplated in this case.

22             THE COURT:  Well, remind me, was that after there was

23   a preliminary approval, before there was final approval?

24             MR. SWARTZ:  Your Honor, do you mean in this case or?

25             THE COURT:  Hello?

1          MR. SWARTZ:  -- in the case?

2          THE COURT:  In --

3          MR. SWARTZ:  Your Honor, do you mean in this case?

4    This is Justin Swartz.

5          THE COURT:  In this case, yes.

6          MR. SWARTZ:  Yes, in this case, the process that we

7    initially negotiated was that the Court would approve the

8    settlement.

9          And then, we would send out checks to the New York

10   non opt-ins.  And those checks would also act as opt-in forms,

11   when they signed them, they would act as opt-in forms and

12   releases as well.

13         And so, they would --

14         THE COURT:  So what was contemplated?  With the final

15   approval and I -- this is -- a final approval by the Court and

16   at that point, individuals would be opting into a closed case?

17         MR. SWARTZ:  Well, the Court wouldn't -- we didn't

18   contemplate that the Court would close the case.  We

19   contemplated the Court would approve the settlement, allow for

20   people to join it, for the Defendants to file the opt-in forms,

21   and then, eventually close the case.

22         So the Court wouldn't have to close the case.  When

23   it approved the settlement, it would leave it open to allow the

24   opt-in forms to be filed.

25         Where we are now, Your Honor, is that --

1            THE COURT:  The --

2            MR. SWARTZ:  Yeah, I'm sorry, go ahead.

3            THE COURT:  No, go ahead.

4            MR. SWARTZ:  I'm sorry, I was just saying that where

5    we are now is that the -- if the notice goes out to these New

6    York non opt-ins, the notice -- I mean, to address Mr. Yam's

7    point, the notice would certainly be very clear that the

8    settlement has not been approved, that this is a settlement

9    that the parties negotiated, that if the settlement is not

10   approved, they would not be entitled to the amount on their

11   notice, and that there would be litigation, that it would just

12   give them an accurate picture without obscuring any facts at

13   all.

14            This is why you should join the case.  You should

15   join this case because it's possible that you're going to get

16   this amount of money.

17            And this is a significant amount of money that could

18   be important to you, that's probably important to you and could

19   certainly help your life.  And that's what --

20            THE COURT:  Are these kind of people --

21            MR. SWARTZ:  Yes?

22            THE COURT:  -- are they being given preferential

23   treatment over those who previously opted in?

24            MR. SWARTZ:  In a way, yes, Your Honor, but to

25   nobody's detriment.  And that's -- I think that's what's

1     important here.

2          I understand the Court's point.  I understand Mr.

3     Yam's point that other people didn't have this information, but

4     those other people are not being disadvantaged at all.  They're

5     actually in the case.

6          And they're getting the settlement share.  I mean,

7     the fact that there's more information available now is

8     certainly better for the New York non opt-ins but -- and

9     they're lucky because of that.

10         Now they have more information.  They can join a case

11    that is settled pending approval.  And that's a much better

12    position to be in than other people who joined the case, but

13    not to anybody's detriment.

14         THE COURT:  Well --

15         MR. SWARTZ:  So there's not being money being taken

16    away from those other people or anything like that.

17         THE COURT:  --- except without this further wave of

18    payments to these other individuals, perhaps the allocation to

19    those who joined earlier could have been -- it could have

20    resulted in -- it could have been negotiated that they would

21    get more money.

22         MR. SWARTZ:  We would -- we weren't able to do that.

23    I mean, the -- you know, the negotiation was based on a certain

24    number of people, certain number of work weeks.

25         I mean, and these negotiations take a lot of twists

1    and turns.  And there's give and take in a number of ways
2    monetary and nonmonetary, but I'm quite sure that if it hadn't
3    been for the fact that we were including payment to the New
4    York non opt-ins, that we would have not been able to negotiate
5    this high settlement amount.
6           I mean, Defendants are -- I mean, it's not 1 to 1.
7    It's not like, you know, we could point to a juncture in the
8    negotiation where we added money for those folks or anything
9    like that.
10          This is not how these negotiations work, but we got
11   more value than we would have gotten had these people not been
12   part of the negotiation.
13          If we weren't providing releases, which has value to
14   these -- to the Defendants and to the detriment of the workers
15   whether -- you know, whether it's a small detriment because the
16   claims are weak or a large detriment because they're strong, we
17   wouldn't have been able to get as much money.
18          So I don't think it's accurate to say that it's
19   actually taking money away from anybody.  It's not.  It added
20   money to the pot and these people are getting their share.
21          The notice can very clearly explain to them that
22   they're not definitely getting this money, that it's pending
23   Court approval.  And we can state in that lay person's terms
24   and make it very clear.
25          The difference between the New York non opt-ins and

1    the non opt-ins for the rest of the country is that the New

2    York non opt-ins have a six-year statute of limitations under

3    this under the -- under another law that covers them, the New

4    York Labor Law.  And that's what it takes us back to, you know,

5    the point that we're talking about before.

6              THE COURT:  Mr. Yam, what is the first name of the

7    Plaintiff in Hobbs or what is the docket number of that case?

8              MR. YAM:  It's Jerry Hobbs.  But in that case, it was

9    a class collective action settlement.  In our case, it's

10   collective opt-in only.

11             So it's a little different, but the mechanism of this

12   procedure, you know, the parties in that case went, you know,

13   went to several mediations and settlement conferences with

14   Magistrate Bulsara.

15             So my understanding -- I mean, so Hobbs wouldn't be

16   on all force with our current case.  What -- I just suggested

17   that and another case, Morales v. Rochdale, which I'm not

18   a -- I wasn't counsel in that case.

19             But my understanding of what judges are doing in

20   these cases right now is there's a clear distinction between a

21   FLSA-only case versus FLSA/New York Labor Law class collection

22   of action settlement case.

23             And it depends on what the particular claim in or

24   opt-in or class member is doing, whether they're opting in and

25   what the releases are.

1          It really affects what the court is going to rule on

2    what the procedure is going to be.  It seems like this is

3    something that Magistrate Bulsara has outlined in many cases.

4          And I just suggested that because it seems like we're

5    running into this issue here where, you know, Your Honor's

6    concerned that this is only an FLSA opt-in only class, but in

7    the Hobbs case that I was counsel in and in the Morales v.

8    Rochdale Village case, FLSA opt-in members do release all the

9    New York Labor Law claims and opt-in claims.

10         So, provided that they are the FL -- you know, their

11   FLSA claims are still live, and you know, they can opt-in to

12   the case, and release all New York Labor Law claims.

13         And this case, which started in -- sometime in 2017,

14   provided they have valid New York Labor Law claims, they would

15   be releasing, you know, claims dating back to 2011 as well if

16   they opted in to the FLSA action.

17         So that -- I wasn't suggesting that (indiscernible).

18         THE COURT:  What is -- well, I asked about Hobbs

19   because you had cited it.  If it's not relevant because it's

20   also a class action, I won't look into it.

21         The Morales case, is that also a hybrid settlement?

22         MR. YAM:  Yes.  Yes, that's also hybrid settlement.

23   So it's not on all force, but the mechanism Magistrate Judge

24   Bulsara does lay out in the cases.

25         So it's not -- I cited because it's not on all force,

1   but because we're going through this procedural discussion, I

2   just cited it because Magistrate Judge Bulsara does go into

3   varied detail about what happens procedurally depending on what

4   claims this opt-in claim is or this class member has.

5             THE COURT:  Well, in effect, the New York -- those

6   who are part of the collective of the New York, who are New

7   York employees or former employees are, in effect, they're

8   being credited for time outside the FLSA statute of

9   limitations.  And they're being compensated for it.

10             So it is in that sense a pseudo-hybrid resolution.

11   What is the docket number in Morales or the first name of the

12   Plaintiff?

13             MR. YAM:  Just give me one second.  I don't have on

14   top -- on top of my head what the -- just give me one second.

15   Let me just pull it real quick.

16             THE COURT:  All right.

17             MR. SWARTZ:  Your Honor, this is Justin Swartz.

18   While Mr. Yam's looking for that, can I address the point the

19   Court just made?

20             THE COURT:  Well, he -- I'd like him to be able to

21   hear.  So --

22             MR. SWARTZ:  Okay, I'm sorry.

23             THE COURT:  -- why don't you --

24             MR. SWARTZ:  Yeah, you're right.  I'll wait.  I'm

25   sorry.

1          MR. YAM:  Yes, Your Honor, so it's Lynica, L-Y-N-I-C-

2    A.  Last name is Morales, M-O-R-A-L-E-S v. Rochdale --

3          THE COURT:  And the docket number?

4          MR. YAM:  Docket number is 15-cv-502-SJB.

5          THE COURT:  Okay, thank you.

6          All right, Mr. Swartz?

7          MR. SWARTZ:  Yeah, thank you, Your Honor.  I -- we

8    respectfully disagree with characterizing the case as a hybrid

9    case or a pseudo-hybrid case.

10         It's not, because especially under the procedure that

11   we negotiated, each person who's going to participate in this

12   case is an actual plaintiff in the case, a party plaintiff,

13   which is, you know, what happens when you join an FLSA

14   collective.

15         So you're not an absent class member.  You're not

16   being represented by anybody in a sense that you're present,

17   you're here.

18         And so, each person in this case then will be signing

19   a document, which will then release all of the claims that they

20   have with respect to labor practices.

21         And so, it's not -- I understand why it seems like it

22   resembles a hybrid case, but it's not, because it doesn't

23   require the operation of Rule 23 to allow these folks to

24   release their New York Labor Law claims.  They're doing it

25   themselves.

1    They're here in the case or they will be once they

2    opt-in.  They're here, and then, they're releasing those

3    claims.  It's not being done to them as absent class members.

4    There's nothing done by operation of any procedural rule.

5    They're actually plaintiffs here in the case who are doing

6    that.

7    That's why these -- and again, that's why we prefer

8    to negotiate settlements like this if we can, because we're

9    only releasing for -- people are only releasing claims they

10   know they're releasing.  They're actually doing it

11   affirmatively and they're getting paid for that.  If they don't

12   do it, they're not getting paid.

13   And that release doesn't just cover FLSA claims, but

14   it covers New York Labor Law claims that arise from the same

15   facts.

16   And so, you know respectfully, I mean, I think it's

17   important --- an important distinction.  That's why I raised

18   it.

19   I mean, that's -- and I think it underlies

20   the -- pretty much the whole discussion we've been having over

21   these two court conferences.  These folks are going to opt-in.

22   They're going to then make the affirmative decision to release

23   these claims.

24   And as far as what they should know before they opt-

25   in, you know, again, it seems to me that they should know

1    exactly what they're opting in to, and why, and have all the

2    information they can have to make that decision.

3            I will offer a compromise, which is something that we

4    discussed with the Defendant.  I -- instead of providing the

5    exact settlement amounts or the individualized settlement

6    amount for each person, which we prefer, because that's

7    information we can get.

8            The Defendants didn't want to provide that -- the

9    information necessary to do that earlier than they're otherwise

10   obligated to, we could include an average settlement amount and

11   say that the Court has not approved the settlement yet, but if

12   it does, that the average settlement will be X dollars based on

13   the number of work weeks worked during the relevant period.

14   And you'll find out what your share will be once and if the

15   settlement is approved.

16           So that would be another way to approach this, but it

17   all comes down to the same point, which is these people are

18   going to be present.

19           Again, they opted in.  And if they are making the

20   decision whether to opt-in, they should know everything they

21   can possibly know.

22           And it's not to anybody's detriment having them know

23   that, even though it is to their advantage, which we concede.

24   And don't just concede, but we -- we're happy if they're

25   getting that benefit.

1    And so, as far as any other questions with respect to

2  our position, I'd be glad to answer, but that's pretty much it,

3  so.

4    THE COURT:  Yes, the compromise that you've just

5  proposed, where you would provide an average settlement amount,

6  how would that be articulated?

7    Would it be if you worked X number of weeks, this is

8  the average?  Or are you just taking the overall average of,

9  you know, based on the fact that there are some Plaintiffs that

10  worked six months and others that worked six years?  How would

11  that approximation be communicated?

12    MR. SWARTZ:  Well, in my opinion, the best way to do

13  it would be, again, the best way to do it would be just to

14  calculate the actual approximate individualized settlement

15  amounts and put those in.

16    But like the compromise they're proposing could

17  be -- it could be either way.  It could be -- it could say that

18  just simply the overall average is approximately $20,000 per

19  person, which we think at least gives people the understanding

20  this is a significant settlement, that they're reeling in a

21  benefit from this, even though some people will get less and

22  some people will get more.

23    Again, that's not preferable in our view to telling

24  people their individualized approximate amounts, but that's one

25  way to do it.

1          Another way to do it would be to say that we

2    negotiated the settlement where people would recover

3    approximately X dollars per work week during these periods,

4    during this -- during these -- within these dates.  And that if

5    the Court approves the settlement, then they will get, you

6    know, approximately that dollar amount per work week.

7          It's not -- that's not preferable again to us,

8    because why not give them individualized numbers if we can it,

9    but again, I'm just offering that because it's something we had

10   discussed with the Defendants.  And if they were more inclined

11   to agree to it, maybe that would resolve the dispute, but maybe

12   it wouldn't.

13   THE COURT:  Would the Defendant be willing to give up

14   its right to reversion and if the -- if a number were not

15   included and the unclaimed funds could be redistributed to

16   those who opted in previously?

17   MR. YAM:  I don't have an answer to that question at

18   this moment.  I'd have to confer with my client, because the

19   reversion was contemplated as part of this agreement and I need

20   to have confirmation about an alternative resolution.

21   THE COURT:  But the reversion that was originally

22   contemplated was a relatively small reversion, because the

23   original agreement was that the checks would be sent out to

24   these individuals and that's what the parties had agreed to

25   until the Court questioned that approach.

1          So it would only be if someone moved and there was no

2   forwarding address or someone thought, hey, I'd rather be pure

3   and not be involved in a class action settlement, so I'm not

4   going to cash a check for $20,000.  So we were talking about a

5   relatively small amount of money, correct?

6          MR. YAM:  Yes.

7          THE COURT:  Um --

8          MR. YAM:  So the main thing that we would want is

9   that finality.  And that's why we had agreed on the nearest non

10  opt-ins and this notice going out.

11         But we -- but again, we're only uncomfortable with

12  the language being in there because the settlement had not been

13  approved yet.

14         Had it been approved, we'd be fine with, you know,

15  the checks going out and all this.  But we're just concerned

16  that, you know, if it's not an approved settlement, then we can

17  get, you know, this whole thing could blow up.

18         We just want to make sure that, you know, has been

19  approved by this Court and the Court's comfortable with

20  approving this and give the Defendant finality on the issues

21  laid in this case.

22         So, the reversion, I'd have to get back to the Court,

23  because you know, reversion back and then, going to the other

24  opt-in members, I have not discussed that with my client.  And

25  I'm not sure, you know, I'd have to discuss with them before I

1        get back to you on that topic.

2                 THE COURT:  I am going to reserve decision on the

3        issue about the language to go out in these opt-in notices to

4        the non opt-in New York Plaintiffs.

5                 I really want to -- as I said, I've been concerned in

6        this case about preferential treatment to different groups.  I

7        raised that at the August proceeding.

8                 I've gotten a revised settlement agreement provided

9        to the Court.  As I noted at the outset, there's really no

10       explanation provided with it.  It's a lengthy document.  We

11       raised a number of issues at the August 12th proceeding.  I'd

12       like to know how the Court's concerns are addressed.

13                I guess there's one issue we can take off the table

14       because I think it was yesterday I saw the Motion for

15       Substitution came in.  And I've reviewed the papers.

16                And although I thought it was a little odd that there

17       was one of the Plaintiffs is the representative of a

18       representative of a former employee, nevertheless, they do

19       seem -- at each step of the way, they seem to be authorized

20       representatives.

21                And the widow of that particular employee, whose name

22       I forget now, had signed the opt-in form.  And then, she passed

23       away.

24                And now it's I believe her daughter is a

25       representative of the estate and trust.  So having reviewed

1    those documents, I'm prepared to approve the substitution.

2           So that issue need not be addressed, but I really

3    would like to get a marked-up copy that shows where the changes

4    are made.

5           That can come by -- through chamber's email address.

6    If you don't have it, Mr. Proujansky, my law clerk, will

7    provide it to you.

8           And I'd also like something filed on the docket

9    explaining the changes and how those changes address the

10   concerns that the Court expressed.

11          And I think then, once I have a better picture of the

12   overall settlement, then I'll make a determination on this

13   issue about the language in the next proposed round of notices

14   to go out.

15          And before that time, if Defense counsel could speak

16   with Defendant and with Plaintiffs' counsel about the question

17   I raised about the reversion, just to see if that's going to be

18   another moving part, because my purpose and the concern I have

19   is not to create a windfall for the Defendant.  That's not what

20   I'm looking to do.  I'm concerned about fairness to the various

21   opt-ins vis a vis one another.

22          All right, so how much time do counsel need to

23   provide the additional information that I just requested?

24          MR. STEVENSON:  Your Honor, this is a -- this is J.R.

25   Stevenson on behalf of Plaintiffs.  If I could just, I wanted

1   to just clarify, do you have the cover letter that we've put

2   forth with the revised settlement agreement that outlines the

3   four issues that the Court had?  Because we did include a cover

4   letter --

5            THE COURT:  Um --

6            MR. STEVENSON:  -- that did break it down and explain

7   what changes were made.

8            THE COURT:  Let me just see.

9            MR. STEVENSON:  It's Document 242, 242.

10           THE COURT:  Yeah, I'm looking, and okay, I apologize,

11   I -- before this proceeding today, I looked at the revised

12   statement and I may have missed that.

13           So I'll review that.  So rather than -- if I have any

14   questions after reading it, I will issue another order.  So the

15   only thing I'll ask for now is a redline or blackline, whatever

16   the preferred term is, of the revisions.

17           MR. STEVENSON:  We'll get that to you today, Your

18   Honor.

19           THE COURT:  Okay, do you need the chamber's email

20   address?

21           MR. STEVENSON:  Yes, please.

22           THE COURT:  All right, I'll ask Mr. Proujansky to

23   send it to you.  And --

24           MR. SWARTZ:  Your Honor, this is Justin Swartz.

25           THE COURT:  Yeah.

```
 1              MR. SWARTZ:  I'm sorry, go ahead, I interrupted.

 2              THE COURT:  No, no, no, go ahead.

 3              MR. SWARTZ:  I was just going to ask -- thank you.  I

 4      was just going to ask if the Court would set a deadline for the

 5      Defendants to inform the Plaintiffs or the Court with respect

 6      to the reversion issue?

 7              THE COURT:  Mr. Yam, how much time do you need?

 8              MR. YAM:  Probably by the end of the week.

 9              THE COURT:  All right, why don't you first speak with

10      Plaintiffs' counsel?  Is that going to change the Plaintiffs'

11      position, let me ask, if the Defendant says, okay, we're not

12      asking that all that money be reverted to the Defendants, then

13      what's the Plaintiffs' position?

14              MR. STEVENSON:  Your Honor --

15              MR. SWARTZ:  Well, our position --- yeah, go ahead.

16              MR. STEVENSON:  Go ahead, Justin.

17              MR. SWARTZ:  Thank you.  This is Justin Swartz.  Our

18      position would be the same.  I just believe that it's relevant

19      to the Court's consideration of the issue, so that's why I

20      wanted to set a deadline, make sure it happened.

21              THE COURT:  Well, it may still be worth having the

22      parties talk with one another.  So I will ask Defendants to

23      communicate that to Plaintiffs by the end of this week.  And

24      then by next Tuesday, if you could inform the Court where that

25      stands, where those discussions stand?
```

1          MR. SWARTZ:  Thank you, Your Honor.

2          MR. YAM:  Thank you, Your Honor.

3          MR. STEVENSON:  Thank you.

4          THE COURT:  All right, anything else?

5          MR. STEVENSON:  Not from the Plaintiffs.

6          THE COURT:  All right, I'm going to terminate this

7    call.  Everyone please take care and stay safe.  Good-bye.

8          MR. YAM:  Thank you, bye bye.

9       (Proceedings concluded at 1:36 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               **CERTIFICATE**

2

3

4           I, Chris Hwang, court approved transcriber, certify

5  that the foregoing is a correct transcript from the official

6  electronic sound recording of the proceedings in the above-

7  entitled matter.

8

9

10

11

12

13  _____          October 28, 2021

14  Chris Hwang                   Date

15  Transcriber

16

17

18

19

20

21

22

23

24

25